178 N.J. Super. 346 (1981)
429 A.2d 360
TOWNSHIP OF PEMBERTON, ETC., ET AL., PLAINTIFFS-RESPONDENTS,
v.
THE STATE OF NEW JERSEY ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1981.
Decided February 13, 1981.
*347 Before Judges ALLCORN, PRESSLER and FURMAN.
Michael S. Bokar, Deputy Attorney General, argued the cause for appellants (John J. Degnan, Attorney General of New Jersey, *348 attorney; Stephen Skillman, Assistant Attorney General, of counsel).
Joseph M. Pinto argued the cause for respondent (Polino & Williams attorneys).
The opinion of the court was delivered by PRESSLER, J.A.D.
The State of New Jersey, Department of Corrections, appeals from a judgment of the Law Division permanently enjoining it from using a residential property purchased by it in Pemberton Township as a home for a small group of pre-adolescent boys between the ages of 8 and 13, who have been committed to the State Training School for Boys at Skillman and who, in the judgment of the Superintendent of Skillman, should and can be successfully diverted from an institutional setting to one approximately as closely as possible a normal family environment. For the reasons herein set forth we reverse and hold that there is no impediment in Pemberton's zoning and other land use ordinances or in a fair consideration of its legitimate local interests inhibiting the Department from proceeding to implement its intended use of the property.
The property in question, referred to throughout the trial as the Goodman house, is located in the New Lisbon section of Pemberton and is one of a group of approximately seven large single-family residences on large lots. The lot size of the property in question is in excess of four acres and includes several outbuildings as well as a large colonial house of distinctive architectural style in an excellent state of repair and containing many bedrooms. The property is located in Pemberton's R-1 zone, which is subject to a 40,000 square foot minimum lot requirement and is apparently part of the township's prime single-family residential neighborhood. The immediate vicinity, while retaining some rural characteristics, also includes a variety of state, county, local and private institutional uses, among them Burlington County College, county and municipal buildings, a *349 private facility housing mental and geriatric patients, a drug abuse rehabilitation center, a juvenile detention center housing 50 juveniles of both sexes awaiting hearing, a minimum-security work release facility, a county geriatric facility and a JINS center.
The availability of the Goodman house came to the attention of Thomas Lynch, Assistant Commissioner for Juvenile Services of the Department of Corrections, in September 1978 in connection with his search for premises for use as a group home for teenage girls who had been adjudicated delinquent and sentenced to a custodial disposition. Impressed with the physical suitability of the property for a group home, he made an initial inquiry of the mayor regarding potential local receptivity to the project. Strong opposition was expressed, on the basis of which Lynch concluded that it would be counterproductive for the Department to pursue that plan. He thereupon and upon consultation with the Commissioner of the Department; William Fauver, the Superintendent of Skillman, Dr. Alfred Vuocolo and other Department officials, conceived of the plan of using the property as a group home for a small number of pre-adolescent boys selected from among the general Skillman population. The time for formulation of the plan and making the logistical arrangements necessary to consummate the purchase was exceedingly limited since the property, which had been on the market for some extended period, was to be offered for sale by its owners at a public auction to be held in mid-October. Lynch did, however, arrange for a field inspection to be conducted by Harold Miller, a social work supervisor at Skillman, who has special expertise and experience in group homes for youngsters. He was to investigate and report on the suitability of the premises for group home for young boys, both in terms of the property itself and the surrounding community, and to determine community sentiment, insofar as possible, by discussions with local officials and neighbors. His report as to the property's suitability was generally favorable although not without reservation, and to the extent he was able to determine community *350 sentiment, his impression was that it was neutral or at least not strongly opposed to the project.
Based on the Miller report Lynch, with Fauver's complete support and Vuocolo's enthusiastic endorsement, proceeded both with plan formulation and acquisition procedures. The plan was predicated on the theory that among the Skillman population, numbering approximately 155, there was an appreciable number of boys whose adjudications of delinquency were based on minor offenses against property and who were committed to Skillman only because of a lack of a suitable home environment adequate to deal with them and their problems. The purpose of the project was thus to create a normal, healthy, stable and supportive family environment for these young boys whose delinquency problems are primarily attributable to the misfortune of having no such families of their own. The family environment concept was to be implemented by selecting six to eight boys, aged 8 to 13, from Skillman to live in the house as if siblings with substitute parents. The substitute parents, also referred to as therapeutic or treatment parents, would be a married couple, both of whom would be professionally trained in either education, social work or psychology. Consistent with the desire to reproduce a family environment, it was further anticipated that no counselling, vocational or other therapeutic programs would be conducted in the home.
In order to insure the success of the family substitute concept of the program, its standards and guidelines were carefully spelled out in the Department's application for funding therefor to the State Law Enforcement Planning Agency (SLEPA). Selection would be limited to boys deemed able, academically, socially and behaviorally, to successfully attend the local public schools and otherwise to integrate with the community. Excluded from consideration for the program would be emotionally disturbed or retarded children, children who had been adjudicated delinquent on the basis of either serious charges or charges involving violent behavior, and children requiring special services such as psychological counselling, therapy sessions and the *351 like. Any child participating in the program evidencing any inappropriate behavior would be immediately returned to Skillman. A residence period of approximately six months was contemplated to permit, among other considerations, school term continuity. The boys would be encouraged to participate in such community activities as Scouts and Little League. Within the home they would perform such chores as are customarily performed by boys of similar age living with their own families. In every respect, therefore, their lives, daily routine and interactions with each other and their substitute parents would reproduce the dynamics and functioning of a natural family.
In addition to the spaciousness of the house and grounds of the Goodman property, other aspects of Pemberton recommended it as an appropriate community for the program. The population is multi-racial, socio-economically heterogeneous and, because of the close proximity to Fort Dix and McGuire Air Force Base, transient in nature to an appreciable extent. Thus, it was Lynch's perception that the boys, in significant respects, would not be much different from their peers in the community and would, therefore, find their own adjustments and accommodations to the substitute family easier to make than they would in a racially, socially and economically homogeneous community of stable population. He also regarded as advantageous the proximity of the County College, it having been the experience at Skillman itself that college students take an active and constructive interest in the welfare of these disadvantaged boys on a volunteer basis. Finally, the fact that Pemberton has its own juvenile delinquency problems also appeared to Lynch to be a positive advantage since the necessity to deal successfully with such children in school would give his boys what he and Vuocolo described as a real-life testing situation.
With respect to the community impact of the program, there runs through the testimony of all of the state officials, Fauver, Lynch, Vuocolo and Miller, the leitmotif of a finely tuned sensitivity to local sentiment, at least partially self-protective because of the perception that a community-based program *352 cannot succeed in the face of substantial community hostility. The minor theme is their experience that every such projected program of the Department inevitably evokes initial community opposition to some degree and hence, if the existence of such opposition were uniformly acceded to, there could be no such Department facilities at all. The Department has, consequently, evolved the policy of assessing the broadness of base and the intensity of local opposition and making a determination of whether or not there is a substantial likelihood, based on the nature of the opposition, the nature of the program and the opportunity for explaining the program to the community, that the program, once initiated, will find community tolerance. The Department made such an assessment here in favor of the program for pre-adolescent boys after having abandoned the projected program for teenage girls because of the strength of local opposition. Indeed, neither Miller nor Lynch had initially perceived any substantial community opposition to the boys' home. As Lynch testified, it was his judgment that the community, having accepted all of the aforedescribed institutional uses, including those involving adult drug addicts and adult convicts, it was not likely that "anybody could object to these little kids." As he further explained
I thought that the key to it was the fact that you were dealing with little boys who would fit nicely into that community. I just envisioned that it would not be much different than the Goodman's home, because the Goodmans have five or six kids themselves and it would be just a large family.
It was also his conviction, after a rather hostile neighborhood meeting which he attended after the purchase, that community understanding of and experience with the program would make it ultimately acceptable. He did in fact persuade one neighbor to support the program by arranging for her to visit Skillman. In summary, then, it was Lynch's reasoning that he was "specially hired by the Department of Corrections to do something for kids and I feel that an alternative to locking them up has to be developed." Thus he opted to go forward with the program because "[he] felt that the opposition was not that strong, that *353 we morally should proceed with the taking care of the kids first."
In the light of this factual background we now address the legal issues before us. The first question is whether the use planned by the Department is a permitted use under the Pemberton zoning ordinance. The trial judge concluded that it was not and hence went on to consider the question of whether or not the State in these circumstances was entitled to rely on its qualified immunity from local zoning and land-use ordinances, a question he also decided adversely to the State. We disagree with both of these holdings.
With respect to the permitted use issue, we first note that the Pemberton ordinance includes "detached dwelling units" within the range of principal uses permitted in the R-1 district. A detached dwelling is defined as
A building physically detached from other buildings or portions of buildings which is occupied or intended to be occupied for residence purposes by one housekeeping unit and which has its own cooking, sleeping, sanitary and general living facilities.
"Housekeeping Unit" is defined as one or more persons "living together in one dwelling unit on a non-seasonal basis and sharing living, sleeping, cooking and sanitary facilities on a non-profit basis." The trial judge agreed that the group home here projected met the literal definition of a permitted dwelling unit but concluded that "[i]n the final analysis, the use is institutional, not intended by the drafters of the ordinance and not within the category of permitted uses."
We are convinced that this reading of the ordinance is too restrictive and that any housekeeping unit encompassed within its definitional prescription is ipso facto a permitted use in a residential zone. We are further persuaded that the law of this State prohibits a municipality from enacting a zoning ordinance which distinguishes, in the context of permitted uses, between a blood-related family unit and a similarly-sized group of persons who are unrelated but who function together as a family unit. That indeed was the holding of Kirsch Holding Co. v. Manasquan, *354 59 N.J. 241 (1971), invalidating as unreasonable and excessively sweeping the provision of an ordinance attempting to deal with the social problems of group summer rentals in a resort community by defining "family" so as to exclude groups of unrelated, unmarried persons. See, also, Gabe Collins Realty, Inc. v. Margate, 112 N.J. Super. 341 (App.Div. 1970). And see State v. Baker, 81 N.J. 99 (1979), invalidating as not reasonably related to the permissible purposes of zoning, a prohibition against more than four unrelated persons sharing a single housing unit.
This prohibition upon such municipal attempts to engage in social engineering by recourse to the land-use power has been extended to provide similar protection for groups of unrelated persons which have been formed for the purpose of permitting traditionally institutional functions to be performed in the more salutary and constructive context of a "reproduced" single-family setting. Thus, a group home to be operated by the Division of Youth and Family Services for 8 to 12 unrelated multi-handicapped preschool children and two foster parents was held to constitute a single family in the zoning sense despite an ordinance provision attempting to limit "family" to persons related by blood, marriage or adoption. Berger v. State, 71 N.J. 206 (1976). A group home operated by a nonprofit association to house ten adolescent girls referred by the Division of Youth and Family Services was held to constitute a family within the local ordinance definition of "a group of persons related by blood or marriage or otherwise lawfully living together in a dwelling unit." YMCA of Summit v. Summit Bd. of Adj., 134 N.J. Super. 384 (Law Div. 1975), aff'd 141 N.J. Super. 315 (App.Div. 1976). Similarly, a transitional residence for former mental patients who functioned together as a family was held to come within the zoning ordinance definition of "single housekeeping unit." Washington Tp. v. Cent. Bergen Comm. Health, 156 N.J. Super. 388 (Law Div. 1978). And a residence occupied by nursing and teaching nuns living as a single household was held to be a permitted single-family use despite an ordinance limiting the *355 definition of family to no more than three persons unrelated by blood, marriage or adoption. Holy Name Hospital v. Montroy, 153 N.J. Super. 181 (Law Div. 1977). We perceive no material conceptual or functional difference between these family-type substitutes for a traditionally institutional alternative and the group home here in question.
Nor do we regard the amendment to the zoning ordinance adopted by Pemberton just after the completion of the trial below as in any way affecting the status of this group home as a permitted residential use. Obviously drafted in haste, the evident import of that amendment is to restrict the use here contemplated to the R-3 zone and to permit it therein only as a conditional use. More specifically, the amendment, in attempting to impose these and other restrictions on the group home use, speaks to "Community residences for the treatment and rehabilitation of juvenile offenders of the N.J. Criminal and Penal Code." For the reasons heretofore stated, we are satisfied that the intended restriction cannot validly apply to those "community residences" which are structured in such a way as to produce a single family unit in the functional sense. Clearly, the group home here proposed constitutes such a unit, and hence it cannot be barred on a use basis from any zoned district to which a biological family would have access. In short, as noted by Justice Mountain in Berger v. State, supra, 71 N.J. at 224, "New Jersey courts have consistently invalidated zoning ordinances that were unreasonably restrictive in delineating permissible occupants." We are satisfied, in view of the nature of the group-home plan here, that there can be no zoning justification for its exclusion from a residential district.
Having determined that the Department's proposed use of the property must be deemed a permitted use under the zoning ordinance as well as a continuation of the residential use theretofore made of the premises we need not decide the merits of the Department's alternative contention that in any event N.J.S.A. 40:55D-66 provides a statutory immunity from local zoning *356 restrictions for such group homes as it here proposes. We deem, however, some comment to be appropriate. N.J.S.A. 40:55D-66(c) provides that
No zoning ordinance shall, by any of its provisions or by any regulation adopted in accordance therewith, discriminate between children who are members of families by reason of their relationship by blood, marriage or adoption, and foster children placed with such families in a dwelling by the Division of Youth and Family Services in the Department of Institutions and Agencies or a duly incorporated child care agency and children placed pursuant to law in single family dwellings known as group homes. As used in this section, the term "group home" means and includes any single family dwelling used in the placement of children pursuant to law recognized as a group home by the Department of Institutions and Agencies in accordance with rules and regulations adopted by the Commissioner of Institutions and Agencies provided, however, that no group home shall contain more than 12 children.
The trial judge was of the view that this provision was not here applicable for the reason that by its terms it is limited to those group homes whose operation is governed by rules and regulations adopted by the Commissioner of Institutions and Agencies[1] and that while there are regulations dealing with group homes operated by the Division of Youth and Family Services (DYFS), N.J.A.C. 10:128-1.1 et seq., there are no such regulations respecting a group home operated directly by the Department of Corrections. We are not persuaded, however, that the group home here is sufficiently different in its material aspects to warrant any less protective status than is statutorily accorded the DYFS facilities. The establishment of the Department of Corrections as a separate entity postdates the adoption of this provision, and the group home here proposed would be, according to the testimony of Department officials, the first of its kind. Its operation is, moreover, subject to the written standards embodied in the SLEPA grant application. We are, therefore, constrained to conclude that the Legislature would not have been likely to have denied protected status to a Department of Corrections group home for children under this *357 statute had the prospect of any such facility been before it when the statute was enacted. We would hope that the matter now being brought to the Legislature's attention, it might opt to clarify any ambiguity in the statute in respect of its scope.
Finally, while we need not reach the qualified immunity issue, we feel constrained to express our disagreement with the application of that doctrine by the trial court. Insofar as we understand the holding of Rutgers v. Piluso, 60 N.J. 142, 152-153 (1972), the existence of a governmental immunity from local land-use regulation must be determined by attempting to ascertain "the legislative intent in this regard with respect to the particular agency or function involved." Since, moreover, legislative intent is rarely expressed, it must "be divined from a consideration of many factors, with a value judgment reached on an overall evaluation." The critical factors, among others, to be considered are the "nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulations would have upon the enterprise concerned and the impact upon legitimate local interest." We further understand Rutgers v. Piluso to say that the last of these factors, the impact upon legitimate local interests, is not actually a consideration in determining if there is an immunity in the first instance but rather that it constitutes that factor which may qualify the immunity if one is otherwise deemed to exist. We so conclude because of the court's further explication that
It is, however, most important to stress that such immunity in any situation is not completely unbridled. Even where it is found to exist, it must not, .... be exercised in an unreasonable fashion so as to arbitrarily override all important legitimate local interests. [at 153; citations omitted].
It is beyond dispute that the affirmative criteria respecting the identity of the instrumentality, the function involved, the public interest to be served and the prohibitory effect of local land use regulation are all met here. The question, then, is whether the immunity thereby established was arbitrarily exercised here. We cannot agree with the trial judge's conclusion that it was *358 because we are unable to perceive in the proposed use any appreciable adverse impact on any important legitimate local interest.
We are first satisfied that the record does not support the conclusion that the Department completely disregarded local zoning or community interests. There is the suggestion that it relied on the real estate broker's representation as to the permissibility of the proposed use. More significant, however, is Lynch's undisputed testimony that prior to purchase he discussed the local land use regulation issue with a Deputy Attorney General who advised him that the State did have immunity from local land-use regulation provided the use it proposed was reasonable and the State's action vis-a-vis the local community was not arbitrary or capricious, and that despite the immunity, the State could not initiate a use or physical facility "completely inappropriate to a given location." We are satisfied that this advice was in substantive accord with the Rutgers holding. Lynch further explained the Department's policy to pursue only projects which could potentially win community acceptance and its general practice, intended to be followed here, of informing local authorities of its plans, accommodating specific local problems whenever possible and in general attempting amicably to resolve any conflicts with the community. There is no reason to conclude that as the project proceeds the State will not honor these commitments. Thus, as heretofore indicated, Lynch made a careful and rational judgment, if up until now an erroneous one, regarding the community's willingness to accept the group home.
We are further persuaded that the project, by its nature, does not have the capacity to substantially impact adversely on legitimate local interests. First, for the reasons already stated, we do not regard it as adversely impinging upon the local zoning and land use prerogatives. The use proposed, even if it were not permitted, is nevertheless functionally compatible with the local zoning scheme and pattern. Even the municipality's planner was unable unequivocally to relate the local objection to the *359 project to legitimate land use objectives, it having been his testimony that "to provide a little scenario for these juvenile problems from a land use point of view does not always become apparent." Nor are we able to perceive any non-land-use related legitimate interest of the community upon which this single home for six to eight pre-adolescent boys will intrude. We point out, moreover, that in respect of the group home for multi-handicapped preschoolers proposed by DYFS and challenged in Berger v. State, supra, the Supreme Court, in dealing with the immunity question there raised, held that "Consideration of these factors [those enumerated by Rutgers v. Piluso, supra] compels the conclusion that the State is immune from the Mantoloking zoning ordinance."
Finally, we note the suggestion by the trial judge of the State's option to seek a variance. In that regard we cannot but conclude that were a variance required, it could not properly be withheld in view of the inherently beneficial nature of the public use here proposed and the patent lack of adverse impact of the community's land use scheme and other legitimate zoning objectives. See, e.g., De Simone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428 (1970); Black v. Montclair, 34 N.J. 105 (1961); Roselle Pk. v. Union Tp., 113 N.J. Super. 87.
The final point here raised by the State is that the trial court had no jurisdiction over this controversy because what was actually involved was an attack on state action. See R. 2:2-3(a)(2). We regard the issue, however, as moot. Were the action brought directly to this court, we would in any event have been required to remand to the trial court for the making of a record, there appearing to be no administrative hearing mechanism for this kind of matter. We further note that the local zoning conflicts involving state agencies heretofore referred to were all initially tried in the Law Division.
The judgment is reversed, the injunction is dissolved and the matter is remanded to the trial court for entry of judgment dismissing the complaint.
NOTES
[1] The statute was not amended when the Department of Institutions and Agencies was eliminated and its functions divided between the Department of Human Services and the Department of Corrections.