261 N.J. Super. 110 (1992)
617 A.2d 1248
EILEEN M. DUNPHY, PLAINTIFF-APPELLANT,
v.
JAMES L. GREGOR, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 27, 1992.
Decided December 23, 1992.
*113 Before Judges R.S. COHEN, MUIR, Jr. and KESTIN.
William J. Vosper, Jr., argued the cause for appellant (Vosper & Maizys, attorneys; Donald J. Maizys on the brief).
Donald S. McCord, Jr., argued the cause for respondent (O'Donnell, McCord & Leslie, attorneys; Donald S. McCord, Jr., of counsel and on the brief).
The opinion of the court was delivered by KESTIN, J.A.D.
*114 In Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980), the Supreme Court held that a parent is eligible to recover damages "for the emotional anguish of watching her young child suffer and die in an accident caused by defendant's negligence." Id. at 90, 417 A.2d 521. Portee requires proof of four elements before a plaintiff may prevail in a cause of action for negligent infliction of emotional distress.
(1) the death or serious physical injury of another caused by defendant's negligence;
(2) a marital or intimate, familial relationship between plaintiff and the injured person;
(3) observation of the death or injury at the scene of the accident; and
(4) resulting severe emotional distress.

Id. at 101, 417 A.2d 521.
This case raises the question whether a plaintiff who was engaged to and cohabitating with the decedent is encompassed within the second element as a matter of law. The issue arises on appeal of the trial court's grant of defendant's motion for summary judgment dismissing the complaint for failure to state a claim upon which relief could be granted. R. 4:6-2, R. 4:46. For the purposes of that motion, defendant conceded that plaintiff could satisfy the remaining three elements of Portee and that the facts were as depicted by the plaintiff. See Portee, supra, 84 N.J. at 90-91, 417 A.2d 521.
Michael Burwell and Eileen Dunphy, the plaintiff, became engaged in April 1988 and began living together in June 1988. Their wedding was planned for February 29, 1992. On September 29, 1990 they responded to a friend's telephone call for emergency assistance on Route 80 in Mt. Arlington. It was mid-afternoon on a clear day. Burwell was tightening the lug nuts on a tire he had replaced on the left rear wheel of the friend's automobile, which was parked on the right shoulder of the roadway. Just before impact, plaintiff saw defendant's car "swerving" from the slow lane toward the shoulder in Burwell's direction. It impacted with the rear bumper of the *115 disabled vehicle and either dragged or propelled Burwell's body 240 feet. When the impact occurred, plaintiff was standing about five feet directly behind the disabled vehicle with its driver who was standing to plaintiff's left. Plaintiff witnessed the impact and its outcome. She ran to her fiance believing him to be dead. When she discovered he was still alive, she did everything she could for him. She wiped blood, dirt and pebbles from his mouth and lips, held his hands and feet as he thrashed about, and talked to him in an effort to comfort him. After Burwell was taken from the scene, plaintiff saw him again as he was quickly wheeled into Dover General Hospital. At about midnight, she saw him fleetingly as he was taken from the recovery room to the intensive care unit. She spent about an hour with him after he was settled in the intensive care unit. Plaintiff reappeared the following morning and spent all of each permitted visiting period with Burwell until his death that afternoon, which was reported to her while she was awaiting the next visit.
As a result of this experience, plaintiff suffered from depression and anxiety, and was being medicated for both conditions at the time of her deposition on April 11, 1991. She was being treated by a psychologist at sessions once or twice a week and by a psychiatrist at sessions four to six weeks apart. Plaintiff seeks damages for her "mental anguish, pain and suffering" experienced as a result of witnessing the events which led to the death of her fiance.
Plaintiff testified at depositions that she had worn an engagement ring before the accident and since, and that "I never take it off." As part of their cohabitation arrangement, plaintiff and her fiance maintained a single checking account from which their bills were paid. Each owned a life insurance policy with the other as named beneficiary. They had jointly purchased an automobile. Plaintiff also testified to some extent about the personal interaction between them, including how Burwell considered them to be already married and would introduce plaintiff as his wife.
*116 This case is governed squarely by the holding and rationale of Portee. Notwithstanding plaintiff's proximity to the accident, her complaint does not allege, nor do her factual allegations support, a cause of action based on bodily injury or sickness resulting from fright or apprehension of danger to herself. See Falzone v. Busch, 45 N.J. 559, 569, 214 A.2d 12 (1965). Plaintiff's actions in assisting and comforting her fiance do not qualify her as a rescuer who becomes physically involved in an heroic effort to extricate another person from harm or otherwise prevent injury from occurring. See Eyrich v. Dam, 193 N.J. Super. 244, 473 A.2d 539 (App.Div. 1984), certif. denied, 97 N.J. 583, 483 A.2d 127 (1984).
Nevertheless, it is clear that plaintiff was in the "zone of risk" of mental or emotional distress notwithstanding that no physical harm to her was actually threatened or apprehended by her. See Portee, supra, 84 N.J. at 94-97, 417 A.2d 521, citing Caputzal v. The Lindsay Co., 48 N.J. 69, 222 A.2d 513 (1966), and the court's reliance therein on the "zone of risk" analysis espoused by Professors Harper and James.
Defendant's conduct must involve foreseeable risk of harm to a class of people that includes plaintiff.... In [some] cases ... plaintiff is outside the zone of physical risk (or there is no risk of physical impact at all), but bodily injury or sickness is brought on by emotional disturbance that in turn is caused by defendant's conduct. Under general principles recovery should be had in such a case if defendant should foresee fright or shock severe enough to cause substantial injury in a person normally constituted. Plaintiff would then be within the zone of risk in very much the same way as are plaintiffs to whom danger is extended by acts of third persons or forces of nature, or their own responses (where these things are foreseeable).
3 F. Harper, F. James and O. Gray, The Law of Torts § 18.4 at 692-93 (2d Ed. 1986) (footnotes omitted).
The Supreme Court itself noted, in summary, that "there was no requirement in the Caputzal formula that the `zone of risk' of mental or emotional distress coincide with a zone of risk of physical harm." Portee, supra, 84 N.J. at 95, 417 A.2d 521. Foreseeability is the key to imposing liability. Ibid. In this case, the foreseeability requirement can be satisfied not only by theoretical formulation, but it is also confirmed by the reality *117 that two persons were standing within several feet of the decedent watching him change a tire. That one or more persons might be present watching or assisting the decedent and that one or more of them would have the requisite close relationship with the victim were not beyond the realm of reasonable expectation.
The "marital or intimate, familial relationship" standard articulated in Portee was held therein to apply to a parent and her young child. Determining whether the standard also includes this plaintiff in her relationship with her fiance requires an understanding of the type of interest the Court meant to protect in articulating the Portee doctrine.
The basic interest warranting protection was clearly articulated by the Court, 84 N.J. at 101, 417 A.2d 521.
Our inquiry has led us to conclude that the interest in personal emotional stability is worthy of legal protection against unreasonable conduct. The emotional harm following the perception of the death or serious injury to a loved one is just as foreseeable as the injury itself, for few persons travel through life alone. Ultimately we must decide whether protecting these emotional interests outweighs an interest against burdening freedom of conduct by imposing a new species of negligence liability. We believe that the interest in emotional stability we have described is sufficiently important to warrant this protection. At the same time we are confident that limiting judicial redress to harm inflicted on intimate emotional bonds by the death or serious injury of a loved one serves to prevent liability from exceeding the culpability of defendant's conduct.
Defendant argues that the relationships included within the scope of protection are limited to those of marriage or blood. Nothing contained in the standard itself embodies such a suggestion. Although it may seem that "marital ... relationship" is a narrow term bespeaking one relationship, that of husband and wife, it cannot be gainsaid that "intimate, familial relationship" is considerably broader and less easily defined. Whatever questions may exist concerning the scope of the "marital or intimate, familial relationship" standard, however, it is clear that the Supreme Court's concern was with the quality and characteristics of a relationship, not with the label affixed to it. It seems obvious that a partner in an estranged marriage *118 might not qualify as a plaintiff by reason of the quality of the relationship, notwithstanding the de jure marital status.
Conversely, because there is no indication on the face of the Portee decision that "intimate, familial relationship[s]" are to be limited to those of consanguinity, it seems logical to explore whether sufficiently intimate relationships which are familial in character may be covered by the Portee standard. In the Court's own language, 84 N.J. at 98, 417 A.2d 521,
The final criterion, that the plaintiff be "closely related" to the injured person, also embodies the judgment that only the most profound emotional interests should receive vindication for their negligent injury. (emphasis supplied).
Consanguinity was not a factor in Berger v. State, 71 N.J. 206, 364 A.2d 993 (1976), where the Supreme Court invalidated a zoning restriction which was based on a narrow definition of "family" as those persons related by blood, marriage, or adoption. The resulting limitation was held to be an undue narrowing of individual liberty in violation of due process standards. The Court, concerned with achieving a workable balance between the power of government and the rights of the people, went so far as to suggest that a municipality which sought "to maintain a prevailing family environment" could do so by restricting occupancy on the basis of "a bona fide single housekeeping unit" rather than imposing a particular definitional standard for "family". Id. at 224-25, 364 A.2d 993. Of similar purport are State v. Baker, 81 N.J. 99, 405 A.2d 368 (1979); Township of Pemberton v. State, 178 N.J. Super. 346, 429 A.2d 360 (App.Div. 1981), certif. denied, 87 N.J. 364, 434 A.2d 1053 (1981); Township of Washington v. Central Bergen Community Mental Health Center, 156 N.J. Super. 388, 383 A.2d 1194 (Law Div. 1978); Holy Name Hosp. v. Montroy, 153 N.J. Super. 181, 379 A.2d 299 (Law Div. 1977) and YWCA v. Board of Adj., Summit, 134 N.J. Super. 384, 341 A.2d 356 (Law Div. 1975), aff'd 141 N.J. Super. 315, 358 A.2d 211 (App.Div. 1976). The result in each of these cases was reached as a matter of State constitutional law notwithstanding the holding in Village of Belle Terre v. Boraas, 416 U.S. 1, 94 S.Ct. 1536, *119 39 L.Ed.2d 797 (1974) that such ordinances were not violative of rights secured by the United States Constitution.
In Borough of Glassboro v. Vallorosi, 117 N.J. 421, 568 A.2d 888 (1990), the Supreme Court held that ten unrelated college students sharing a home satisfied a zoning requirement limiting occupancy to families because their occupancy was characterized by "stability" and "permanency" and could be described as the "functional equivalent of a family." Id. at 433, 568 A.2d 888 (quoting Borough of Glassboro v. Vallorosi, 221 N.J. Super. 610, 620, 535 A.2d 544 (Ch.Div. 1987)). The findings that led to this conclusion were that the students often ate meals together or in small groups; they cooked for each other; they shared the household chores, grocery shopping and yard work; they maintained a common checking account from which costs of food and other household expenses were paid; they shared a telephone; and they intended to remain in the house as tenants as long as they were enrolled at Glassboro State College.
The Glassboro case may be contrasted with Open Door Alcoholism Prog. v. Board of Adj., New Brunswick, 200 N.J. Super. 191, 491 A.2d 17 (App.Div. 1985) in which ten recovering alcoholics were held not to constitute a family for zoning purposes because residency in the halfway house at issue was transient and therefore lacking in the "stability, permanency and functional lifestyle which is equivalent to that of the traditional family unit". Id. at 199-200, 491 A.2d 17.
It is illuminating to consider all of these land use cases together. Their unifying principle is that the status of "family" is not to be determined by application of a verbal formula but rather by particularized attention to the qualities of the actual relationships at issue in the context of the goals sought to be served by the legal standard at issue.
The Supreme Court has invoked the same flexible approach in interpreting and applying the Workers' Compensation statute with respect to the definition of "wife".... In Parkinson v. J. & S. Tool Co., 64 N.J. 159, 313 A.2d 609 (1974), the petitioner *120 and her decedent had once been married and were divorced. Eleven years after their divorce, they resumed cohabitation without remarrying, having been assured by their priest that they were still married "in the eyes of God." The decedent died from an accident arising out of and in the course of his employment. Petitioner claimed death benefits as the dependent wife of the decedent, the only statutory eligibility which she could conceivably claim under N.J.S.A. 34:15-13(f), notwithstanding, as she testified, "that she understood the nature of her divorced status under the law, that she was no longer legally married." Parkinson, supra, 64 N.J. at 160, 313 A.2d 609. The Judge of Compensation held petitioner not to qualify as a dependent wife. The Appellate Division affirmed, holding that petitioner's status as a de facto wife was an inadequate basis upon which to found a dependency claim. The Supreme Court reversed because it determined the public policies underlying the act to be furthered by a recognition of petitioner's de facto status, i.e., the qualities of her relationship with the decedent. This result was reached notwithstanding the Legislature's 1939 declaration in N.J.S.A. 37:1-10 invalidating "common law marriages"; requiring the contracting parties to secure a marriage license and engage in a ceremony before one authorized to solemnize marriages; and declaring any noncomplying purported marriage to be "absolutely void."
The reasoning and result in Parkinson was based in large part upon Dawson v. Hatfield Wire and Cable Co., 59 N.J. 190, 280 A.2d 173 (1971), in which petitioner and her decedent had resided together for sixteen years after a ceremonial marriage in Elkton, Maryland in 1949, until he died as a result of a work-connected accident. An eligibility issue was created when, at the hearing before the Judge of Compensation, the employer produced a witness who testified that she and the decedent had been married in Georgia in 1942. In subsequent proceedings on a remand after appeal, petitioner herself, in an apparent effort to nullify the 1942 marriage, introduced evidence to support an earlier common law marriage between decedent and yet another *121 woman. The Supreme Court held petitioner to be covered by the dependency provisions of the Workers' Compensation Act because she had entered into her marriage in good faith; the relationship had been, in every way, a de facto marriage; and there was no challenge to her claim of economic dependence. The Court determined that the public policies underlying workers' compensation concepts would be best served by holding petitioner to be covered. There were two concurrences. In one of them, Chief Justice Weintraub opined that the Workers' Compensation statute required a de jure marital relationship for dependency eligibility, but that the employer lacked standing to attack petitioner's status "merely because he could escape a dollar liability." Id. at 199, 280 A.2d 173. The Chief Justice also observed: "[t]o the employer the marital status of an employee is merely a fortuitous fact." Ibid. See also, Stellmah v. Hunterdon Coop. G.L.F. Serv., Inc., 47 N.J. 163, 219 A.2d 616 (1966). But see, Miles v. Theobald Industries, 144 N.J. Super. 535, 366 A.2d 710 (App.Div. 1976), certif. denied, 73 N.J. 51, 372 A.2d 316 (1977).
The definition of "relative", a term corresponding to "familial", has been dealt with by the Appellate Division in cases involving automobile insurance. In applying statutory language, interpreting the terms of contracts of insurance, and divining the expectations of parties to those contracts, different panels have reached a variety of results in dealing with the technical intricacies of personal injury protection and uninsured and underinsured motorist coverage. See Handler v. State Farm Ins., 253 N.J. Super. 641, 602 A.2d 796 (App.Div. 1992); State Farm Ins. Co. v. Pizzi, 208 N.J. Super. 152, 505 A.2d 160 (App.Div. 1986); James by Robertson v. Allstate Ins. Co., 201 N.J. Super. 299, 493 A.2d 28 (App.Div. 1985); Wood v. State Farm Ins. Co., 178 N.J. Super. 607, 429 A.2d 1082 (App.Div. 1981); Brokenbaugh v. N.J. Manufacturers Ins. Co., 158 N.J. Super. 424, 386 A.2d 433 (App.Div. 1978). These cases, which are based on principles of contract construction, are not *122 useful in developing an understanding of the policies that inform the standards governing tort law.
Where definitional flexibility has been the key approach in other areas of the law, we can discern no reason why it should not guide the development and application of common law tort standards. It is clear that the meaning of "intimate, familial relationship" for the purposes of eligibility to sue in tort must be based upon the qualities and characteristics of the particular relationship and not upon a mechanistic formula in a definition. The Supreme Court spoke specifically of parental love in Portee, supra, 84 N.J. at 98, 417 A.2d 521, because the case involved a parent and a child. It said:
... only the most profound emotional interests should receive vindication for their negligent injury.
Our analysis of the specific emotional interest injured in this case  a fundamental interest in emotional tranquility founded on parental love  reveals where the limits of liability would lie.... [W]e find ... the existence of a close relationship ... to be ... crucial. It is the presence of deep, intimate, familial ties between the plaintiff and the physically injured person that makes the harm to emotional tranquility so serious and compelling. The genuine suffering which flows from such harm stands in stark contrast to the setbacks and sorrows of everyday life, or even the apprehension of harm to another, less intimate person.
The very same considerations govern relationships other than that of parent and child.
Irrespective of the label placed upon a particular relationship, it is a jury question whether the inter-personal bonds upon which the cause of action is necessarily based actually exist. A defendant should always have the right, even in the case of a parent and child or a husband and wife, to test the operative facts upon which the claim is based irrespective of the de jure relationship. The credibility of the plaintiff's claim of emotional attachment should always be open to disproof, and not presumed to exist just because a particular degree of kinship exists. The jury should have the opportunity to determine, based on all relevant factors, whether the claim of emotional harm

*123 is measured by the reactions to be expected of normal persons. Ordinarily one does not have the duty to be careful not to shock or frighten people. Activity may be geared to a workaday world rather than to the hypersensitive. It may be otherwise, however, if defendant has knowledge or notice of the presence of idiosyncrasy in any given case. This, of course, is the application of a pervading principle of tort law.
3 F. Harper, F. James & O. Gray, The Law of Torts § 18.4 at 691-92 (2d ed. 1986) (footnotes omitted).
This plaintiff, possibly even more poignantly than the plaintiff in Portee, not only witnessed some of the efforts to save the life of her fiance, but she also saw every split second of the accident happen; and she personally ministered to the victim as best she could immediately following the impact.
To foreclose such a plaintiff from making a claim based upon emotional harm because her relationship with the injured person does not carry a particular label is to work a potential injustice, not only in this case but also in too many other instances in which the events leading to injury or death are indelibly stunning, and where the emotional injury is genuine and substantial and is based upon a relationship of significant duration that, at the time of injury, is deep, lasting and genuinely intimate. Important considerations in reaching a conclusion on this issue concerning a particular relationship should include whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements. Whatever tests are used, it is essential that a distinction be made between ordinary emotional injuries such as would be experienced by relatives and friends in general and those which are so profound as to strike "at the plaintiff's basic emotional security" (Portee, supra, 84 N.J. at 99, 417 A.2d 521) because of a special, intimate, familial-type relationship with the victim.
The law, for lack of a label when these criteria are satisfied, should not ignore the fact of deep emotional attachment between a step-parent and a step-child, a foster parent *124 and a potential adoptee, or any two persons who share an adequately earnest emotional commitment in a relationship that is functionally equivalent to familial. The Supreme Court itself has furnished the rationale for such a conclusion.
The knowledge that loved ones are safe and whole is the deepest wellspring of emotional welfare. Against that reassuring background, the flashes of anxiety and disappointment that mar our lives take on softer hues. No loss is greater than the loss of a loved one, and no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure. The law should find more than pity for one who is stricken by seeing that a loved one has been critically injured or killed.

Portee, supra, 84 N.J. at 97, 417 A.2d 521.
The record before us is sparse. It contains no more than plaintiff's allegations supported by a single depositions session during which little detail was developed. Having given what we have the indulgent examination a plaintiff is entitled to on a defendant's motion for summary judgment, we conclude this plaintiff has made a showing sufficient to survive the motion. She should not be precluded from advancing her claim of negligent infliction of emotional distress for testing in the crucible of a civil action.
Reversed and remanded.
MUIR, Jr., J.A.D., dissenting.
The issue on this appeal is whether the cause of action for negligent infliction of emotional distress endorsed in Portee v. Jaffee, 84 N.J. 88, 417 A.2d 521 (1980), is available to a person unrelated by marriage or blood to the victim of a third party's negligent conduct. The majority finds it is. I disagree.
Portee set strict limits on the relationship between the plaintiff and the person injured by the negligence of a third party. It confined the relationship to "marital or intimate, familial relationship." Id. at 101, 417 A.2d 521. That relationship is pivotal because its existence is what makes the cause of action, the harm to emotional tranquility, "so serious and compelling." Id. at 98, 417 A.2d 521. We have no marital relationship here. Nor do we have an intimate familial relationship. The majority *125 analogizes to other inappropriate areas of the law to find a familial relationship. I read the Portee familial relationship to be limited to blood ties. The concept of "deep, intimate, familial ties" is designed to assure a closeness of blood ties, not designed to provide for expansion to what current sociological thinking may consider a familial relationship. See id. at 98, 417 A.2d 521. Many non-marital, non-blood tie living relationships that exist today may claim a functional or emotional equivalent to a family or marital relationship. If persons in those relationships are to be afforded the cause of action recognized by Portee, it is for the Supreme Court, not this court, to make that expansion. Eyrich for Eyrich v. Dam, 193 N.J. Super. 244, 259, 473 A.2d 539 (App.Div. 1984).
Moreover, there are sound reasons against such expansion that the majority ignores. In Portee the Supreme Court relied on the decision of the California Supreme Court in Dillon v. Legg, 68 Cal.2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968), to establish the emotional distress cause of action. The California Supreme Court has since rejected an expansion of the cause of action to a cohabitant relationship with similarities to a marital relationship. Elden v. Sheldon, 46 Cal.3d 267, 250 Cal. Rptr. 254, 758 P.2d 582 (1988). The Elden court identified the state's interest in promoting marriage, abolishment of common law marriage, the problems created for the courts by expansion of the doctrine, and the need to limit the number of persons to whom a negligent defendant owes a duty of care as grounds for denying expansion of the cause of action. Id., 250 Cal. Rptr. at 258-61, 758 P.2d at 586-88. The court developed those reasons thoroughly and logically. Further expansion here is unnecessary.
In sum, if the cause of action created by Portee is to be expanded beyond a marital or blood-tie relationship, it is for the Supreme Court, not this court, to do so. Moreover, I conclude the cause of action should not be expanded for the reasons set forth in Elden v. Sheldon, supra.
*126 I would affirm the trial court dismissal of plaintiff's complaint.