NOT FOR PUBLICATION WITHOUT THE
PRIOR APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4754-16T4

I'ASIA MORELAND, Individually and
as the Administratrix of the Estate
of I'MAYA MORELAND, I'ASIA MORELAND,
Guardian Ad Litem on behalf of
I'ZHIR MORELAND, and VALERIE BENNING,

    Plaintiffs-Appellants,

v.

WILLIAM PARKS, RONALD HUBSCHER, JR.,
ALBERT DINATALE, BENITO BELLO, CITY OF
TRENTON, and COUNTY OF MERCER,

    Defendants-Respondents,

and

SOVEREIGN BANK ARENA, n/k/a SUN BANK
ARENA, MERCER COUNTY IMPROVEMENT
AUTHORITY, STATE OF NEW JERSEY,
and GLOBAL SPECTRUM,

    Defendants.

| **APPROVED FOR PUBLICATION** |
| :---: |
| **August 17, 2018** |
| **APPELLATE DIVISION** |

_____

Argued January 17, 2018 – Decided August 17, 2018

Before Judge Fuentes, Manahan, and Suter.

On appeal from Superior Court of New Jersey,
Law Division, Mercer County, Docket No. L-
0227-11.

Robin Kay Lord argued the cause for appellants
(Law Offices of Robin Kay Lord, LLC and
Kardos, Rickles, Hand & Bidlingmaier,

attorneys; Robin Kay Lord and Clifford D. Bidlingmaier, III, on the brief).

Elizabeth C. Chierici argued the cause for respondent William Parks (Chierici, Chierici & Smith, attorneys; Donald R. Chierici, Jr., on the brief).

William J. O'Kane, Jr. argued the cause for respondent Ronald Hubscher (Archer & Greiner, P.C., attorneys; Frank D. Allen, William J. O'Kane, Jr., and Suzanne K. Collins, on the brief).

John Morelli argued the cause for respondent City of Trenton, Albert DiNatale and Benito Bello.

Lillian L. Nazzaro argued the cause for respondent County of Mercer (Arthur R. Sypek, Jr. Mercer County Counsel, attorney; Lillian L. Nazzaro, Assistant County Counsel, on the brief).

Jennifer L. Hamilton argued the cause for amicus curiae Garden State Equality, Inc. (Hamilton Law, attorneys; Jennifer L. Hamilton, on the brief).

Thomas H. Prol argued the cause for amicus curiae New Jersey State Bar Association (Robert B. Hille, President, New Jersey State Bar Association, attorney; Robert B. Hille, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

On January 30, 2009, Valerie Benning and I'Asia Moreland were a same-sex couple who lived together with Moreland's two biological children, I'Zhir, who was nearly five years old, and his younger

sister, two-year-old I'Maya. Benning's godson, Armonti Martinez, also lived with the couple at the time. On that date, these two adults and three children were waiting to cross a street to attend the "Disney on Ice" show at the Sun Bank Arts Center in Trenton, now known as CURE Insurance Arena. While Benning and I'Maya were holding hands waiting to cross the street, a fire truck and a pickup truck collided. The pickup truck struck I'Maya, propelling her body sixty-five feet south of the intersection where she and her family had been standing. Two-year-old I'Maya died as a result of the accident.

Plaintiffs filed a civil action against defendants predicated on several theories of civil liability, including bystander negligent infliction of emotional distress (NIED). After joinder of issue and the exchange of discovery, the trial court granted defendants' motion for partial summary judgment to dismiss Benning's bystander NIED claim. The motion judge found Benning did not present sufficient evidence that she had an "intimate, familial relationship" with two-year-old I'Maya to satisfy the requirements to bring a claim under Portee v. Jaffee, 84 N.J. 88 (1980).

Plaintiffs moved before this court for leave to appeal the trial court's order granting partial summary judgment on this issue. Garden State Equality, Inc., and the New Jersey State Bar

Association moved to participate as Amici Curiae. In an order dated February 6, 2017, we denied the motion for leave to appeal. By order dated July 7, 2017, the Supreme Court granted plaintiffs' and amici's motions for leave to appeal and summarily remanded this matter for this court to determine "whether plaintiff [Valerie Benning] may pursue her claims for negligent infliction of emotional distress" under <u>Portee</u>.

After reviewing the record presented to the Law Division, we conclude the motion judge erred in dismissing Benning's claims under <u>Portee</u> as a matter of law. We thus remand this matter to the trial court for such further proceedings as may be warranted, including a trial before a jury.

I

I'Maya was not biologically related to Benning. At the time of the accident, Benning did not have legal custody rights to either I'Maya or her older brother I'Zhir. According to her deposition testimony taken on September 7, 2012, Benning met Moreland in August 2007, when Moreland was working at Foot Locker and Benning "just happened to be shopping." They exchanged phone numbers and started dating on August 22, 2007. The record does not precisely identify the date when Benning and Moreland began living together as a family. Viewing the evidence in the light most favorable to Benning, they have been living together since

4

approximately 2008. Thus, at the time of Benning's deposition in September 2012, they had been living together for nearly five years. They were engaged on November 19, 2011, and were married on March 31, 2014.

I'Maya was approximately thirteen months old when Benning and Moreland began their romantic relationship. At the time of the accident, their household included Benning's godson Armonti, and Moreland's biological children, I'Maya and I'Zhir. Benning testified at her deposition that I'Maya began calling her "mom" or "mommy" a few weeks into her relationship with Moreland; it took approximately three months for the older boy I'Zhir to start calling Benning "mom." In a psychological evaluation report dated October 12, 2015, Dr. Gerald Cooke noted that I'Zhir drew "[m]ommy Val", "[m]ommy I'Asia," himself, I'Maya, and Armonti. Dr. Cooke also noted that despite the death of his younger sister and Armonti's departure to live with his mother, I'Zhir "still thinks of both of them as part of the family." He opined that the child "feels safest when he is with his two moms and also his grandmother and his extended family."

On the day of the accident, Benning was holding I'Maya's hand as they waited to cross Route 129 to see Disney on Ice. Benning described hearing the fire truck's sirens, which alerted her to stop and "find out which way it was coming from so I wouldn't put

my kids into danger." She has no recollection of the accident itself. At her deposition, defense counsel asked Benning to describe her reaction immediately after the accident:

Q. Do you recall being struck by anything?

A. No, I just remember being on the ground.

Q. Do you have any recollection with respect to the incident once you were picked up by [Moreland]?

A. After I was picked by [Moreland], she asked me if I was okay. And Armonti was screaming at the top of his lungs at the time. And I'Zhir was saying that . . . he was okay, but he was scared, and he started to scream, a fire truck hit my sister, a fire truck hit my sister. And I didn't understand what he was saying, you know. I didn't know what he was saying.

But, you know, I was trying to gather myself. So I asked [Moreland], I said, where is Maya? And she said, I don't know. And I looked down, and I didn't see her. And Armonti was still screaming, but he was on the ground, because he couldn't stand up. And at first we thought that he was just . . . like screaming typical of a two-year-old, but his legs and his ankles were broke, and he couldn't move.

And at that point I noticed that I'Maya was no longer holding my hand, and it dawned on me that [Moreland] was lifting me up. So I knew she wasn't, you know, next to me. And I looked up, and she was far away from me . . . going southbound. She was . . . further back on the highway . . . .

Q. Okay.

A. After that, I looked at [Moreland]. She tried to pick Monti up. And I told her -- just gave her a look or -- that I was going to, you know, go get Maya. And just started running. It felt like forever.

Q. Take your time. Take your time. I realize this is difficult.

A. I'm sorry.

Q. That's okay.

. . . .

A. The death of anyone's child is devastating, but to talk about your own or one that you love like your own is even harder. Okay.

Q. Take your time.

A. At that point I remember [Moreland] like trying to scream, she's like, is Maya okay? And I knew she was not okay. She was not okay. Within seconds after that, there was a female, I don't know who she was, and her child -- her child -- I heard he just started screaming, mom, please help them, mom, please help them, mom.

I'Maya and Benning were brought to the hospital in separate ambulances. While en route to the hospital, Benning responded to the questions the Emergency Medical Technicians (EMT) had about I'Maya's medical history. Benning testified that she told the EMTs that I'Maya had a rare "G6 PD"[1] deficiency and generally

_____

[1] According to the National Institute of Health, Genetics Home Reference:

described her "likes and dislikes."  When she arrived in the emergency room, Benning heard I'Zhir tell the medical staff: "my name is I'Zhir, and I have two moms, and I know where I live . . . ."

Benning testified that she became hysterical after she learned that I'Maya had died.  She was placed in restraints until she agreed to take some form of sedative "so I could say goodbye" before the medical staff removed the child's body.  The nurses removed Benning's restraints after the sedatives began to calm her down.  Benning was also involved in the financial decisions regarding the child's funeral arrangements.  She and Moreland borrowed money from their families to pay for the cost of the funeral.  The record also contains reports of psychological evaluations that describe the emotional and psychological trauma

---

Glucose-6-phosphate dehydrogenase deficiency is a genetic disorder that occurs almost exclusively in males. This condition mainly affects red blood cells, which carry oxygen from the lungs to tissues throughout the body. In affected individuals, a defect in an enzyme called glucose-6-phosphate dehydrogenase causes red blood cells to break down prematurely. This destruction of red blood cells is called hemolysis.

[Genetics Home Reference, Glucose-6-phosphate dehydrogenase deficiency, National Institute of Health, https://ghr.nlm.nih.gov/condition/glucose-6-phosphate-dehydrogenase-deficiency.]

A-4754-16T4

Benning suffered as an aftershock of I'Maya's death and the emotional pain she continues to suffer.

## II

The motion judge characterized Benning and Moreland's relationship at the time of the accident as "lovers." With respect to Benning's relationship with I'Maya, the judge found:

> The plaintiffs allege that the decedent . . . referred to Ms. Benning as mom. It seemed clear that a [Portee] claim . . . is reserved to those who are actually closer related and, not only closely related by way of being family but also in an intimate family relationship. So an intimate relationship alone would not suffice.
>
> There is a requirement that they have to be family. [Portee] talks about familial relationship but it didn't say family-ish or something similar to a family. It says familial and there are cases that must use the word family. It has to be family and there's no question of fact that Ms. Benning was not. The evidence is that she was a girlfriend and she might have been part of the child's household, but by any definition that I can find in the law about family, Ms. Benning doesn't meet it. The undisputed facts are that she was neither a biological or adoptive parent . . . .

The judge also considered the concept of "psychological parent,[2]" but rejected its application here because Benning had

---

[2] The term "psychological parent" was first discussed by our Supreme Court in V.C. v. M.J.B., 163 N.J. 200 (2000). In that case, the Court was "called on to determine what legal standard

not presented expert evidence in support of this approach.  The

judge found expert testimony was necessary

> to know what goes on in a [two]-year-old's
> mind, I understand that the [two]-year old has
> passed away, you can't do a psychological
> evaluation now but if there had been an
> application for custody where Ms. Benning was
> proposing that she was a psychological parent,
> that could have happened during the [two]-
> year-old's lifetime.  It didn't happen so
> there's no such report . . . [and] [j]ust using
> the word mom all by itself doesn't count for
> much, whether there's a secure relationship,
> a bonded relationship, a reliant relationship,
> whether this is someone that the [two]-year-
> old would have looked to for a comfort, the
> facts just aren't there to be able to know
> those things.  And that's where I go back to
> the standard for summary judgment.  There
> actually has to be facts.  It's one thing to
> give favorable inferences which . . . I have
> to do for summary judgment, but here . . .
> what was going on in a [two]-year-olds mind
> in terms of that relationship, there's just
> no way to be able to get that information and
> it's never going to come out.

The motion judge also distinguished the issue here from the

Court's holding in Dunphy v. Gregor, 136 N.J. 99 (1994), where the

---

applies to a third party's claim to joint custody and visitation
of her former domestic partner's biological children, with whom
she lived in a familial setting and in respect of whom she claims
to have functioned as a psychological parent." Id. at 205.  The
legal and public policy considerations that led the Court in V.C.
to recognize the concept of "psychological parent" in the context
of a child custody dispute in the Family Part, are not dispositive
to a determination of whether Benning falls within the class of
litigants who may bring a Portee claim.

Court allowed a NIED claim brought by the fiancée of a decedent to proceed to a jury trial. The judge explained:

> Ms. Moreland and Ms. Benning weren't even engaged at the time. I understand the laws regarding same sex relationships had changed over time but there was a statute that did allow for that in New Jersey and whether they could have availed themselves of any such laws in other jurisdictions hasn't been addressed in any of the papers.

In dismissing Benning's NIED claim, the motion judge found that "Ms. Benning was part of a very small child's life for 17 months at most . . . . There's no evidence that there was any permanent bond or that the relationship that she shared with the decedent was one that was deep, lasting, and genuinely intimate."

### III

On appeal, plaintiffs argue that Benning is entitled to bring a bystander NIED claim because her relationship with I'Maya was intimate and familial. They argue the motion judge erroneously focused his analysis on the relationship between Benning and Moreland and the absence of evidence showing their relationship was formally sanctioned by the legal avenues available to them at the time, such as a civil union or domestic partnership. Plaintiffs also argue the judge misapplied the standards for deciding a motion for summary judgment by drawing an adverse inference against them for failing to seek formal legal recognition

11

of the relationship between Benning and the child. Plaintiffs argue that whether the relationship between I'Maya and Benning qualifies for recovery under Portee is a question of fact for the jury.

Defendants argue that summary judgment is the appropriate way to proceed in this case. They maintain that the question of whether Benning's relationship with the child entitles her to bring a NIED claim is a question of law that was appropriately decided by the motion judge. Defendants argue Benning has not presented sufficient competent evidence to satisfy all of the elements of the tort of NIED.

Amicus Garden State Equality is a civil rights organization dedicated to protecting and advancing the legal rights of this State's LGBTQ community. It argues that the Law Division erred in dismissing Benning's NIED claim as a matter of law because there are genuine issues of material fact regarding the nature of I'Maya and Benning's relationship. Garden State Equality further argues that the trial court erred by considering the marital status of Moreland and Benning in determining the relationship between I'Maya and Benning. Amicus argues this approach ultimately discriminates against same-sex couples by holding them to a higher standard than the standard applied to heterosexual couples.

Amicus New Jersey State Bar Association (NJSBA) argues that the type of intimate familial relationship required to bring a <u>Portee</u> claim is not strictly limited to plaintiff's marital status to the child's biological parent; or whether she had a legally recognized custodial status to the decedent; or even whether she was biologically related to the decedent. The NJSBA argues that the quality of Benning and I'Maya's relationship is the relevant issue here. This Amicus argues that is purely a factual issue that must be considered and decided by a jury.

The sole legal question the Supreme Court ordered us to address is whether Benning falls within the class of litigants entitled to bring a civil action against defendants under the tort of negligent infliction of emotional distress. We begin our analysis by describing the material facts in <u>Portee</u>, the seminal case that first recognized the legal viability of this cause of action in our State, and which also involved the accidental death of a child. In <u>Portee</u>, a seven-year old boy became trapped between an elevator's outer doors and the wall of the elevator shaft. <u>Portee</u>, 84 N.J. at 91. His mother watched helplessly as her son struggled for over four hours as rescue workers made repeated, but ultimately unsuccessful attempts to save the child's life. <u>Ibid.</u> The mother witnessed her son's agonizing death. <u>Ibid.</u>

Witnessing the horrific demise of her child caused the mother severe emotional pain and serious psychological trauma. _Ibid._ She became "severely depressed and self-destructive." _Ibid._ She was hospitalized after an attempted suicide and was treated for self-inflicted injuries. _Ibid._ She thereafter "received extensive counseling and psychotherapy to help overcome the mental and emotional problems caused by her son's death." _Id._ at 92. As the guardian of our State's common law, the Supreme Court fashioned the tort of negligent infliction of emotional distress to permit a limited class of litigants the right to seek a measure of compensation for the residual emotional and psychic trauma caused by the negligence of the tortfeasor. As Justice Pashman explained:

> The cause of action we approve today for the negligent infliction of emotional distress requires proof of the following elements: (1) <u>the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress</u>. We find that a defendant's duty of reasonable care to avoid physical harm to others extends to the avoidance of this type of mental and emotional harm.
>
> [_Portee_, 84 N.J. at 101 (emphasis added).]

Justice Pashman ended his description of the essential elements of this tort by quoting the words of Chief Justice

Weintraub: "Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Ibid. (quoting Goldberg v. Housing Auth. of Newark, 38 N.J. 578, 583 (1962)). Our Supreme Court has revisited its holding in Portee to expand the class of litigants entitled to relief when necessary to serve its underlying public policy, Dunphy v. Gregor, 136 N.J. 99 (1994) (permitting the fiancée of the decedent to bring a claim), and to clarify and narrow its scope when warranted, McDougall v. Lamm, 211 N.J. 203 (2012) (denying relief to a litigant who witnessed the traumatic death of a pet).

Our focus here is exclusively on the second element of the four elements of proof required to bring a negligent infliction of emotional distress cause of action, to wit: whether Benning presented sufficient evidence that an "intimate, familial relationship" existed between her and two-year-old I'Maya at the time the child tragically perished in this accident. Portee, 84 N.J. at 101. Because the Law Division decided this issue as a matter of law, our review is de novo. We do not accord any deference to the motion judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

What constitutes a "familial relationship" is perforce a fact-sensitive analysis, driven by evolving social and moral forces.  No one can reasonably question that the social and legal concept of "family" has significantly evolved since the Court decided Portee in 1980.  Thirty-eight years ago, gay, lesbian, and transgender people were socially shunned and legally unprotected against invidious discrimination in employment, housing, and places of public accommodation under our State's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49.[3]  The notion of same-sex couples and their children constituting a "familial relationship" worthy of legal recognition was considered by a significant number of our fellow citizens as socially and morally repugnant and legally absurd.

The overwhelming number of our fellow citizens now unequivocally reject this shameful, morally untenable bigotry; our laws, both legislatively and through judicial decisions, now recognize and protect the rights of LGBTQ people to equal dignity and treatment under law.  Throughout our country, United States v. Windsor, 570 U.S. 744 (2013), and in our State, Garden State Equal. v. Dow, 434 N.J. Super. 163 (App. Div.), certif. granted,

_____

[3] The Legislature did not amend the Law Against Discrimination to prohibit invidious discrimination in employment, housing, and places of public accommodation on the basis of "sexual orientation" until 1992.  See N.J.S.A. 10:5-4; A. 519 (1991); S. 3758 (1992).

216 N.J. 1, <u>stay denied</u>, 216 N.J. 314 (2013), same-sex couples may legally marry and have children.

Following this path of social and legal progress under law, we now turn our attention to <u>Dunphy</u>, a case through which our Supreme Court clarified the second element of a <u>Portee</u> claim. The plaintiff and the decedent in <u>Dunphy</u> were a heterosexual couple who cohabitated and were engaged to be married. <u>Dunphy</u>, 136 N.J. at 102. They planned to marry four years after their engagement. <u>Ibid.</u> Two years into their engagement, the decedent was killed on Route 80 while helping a friend change a tire. <u>Ibid.</u> The plaintiff witnessed the vehicle strike her fiancée. <u>Ibid.</u> She was the first person to reach his body, and attempted to comfort him. <u>Ibid.</u> He died the next day in the hospital. <u>Ibid.</u>

The case came before the Supreme Court based on a dissent in the Appellate Division opinion. <u>Dunphy v. Gregor</u>, 261 N.J. Super. 110, 124 (App. Div. 1992). Our dissenting colleague "interpreted the <u>Portee</u> requirement of a 'familial relationship' as one restricted to marriage or blood ties." <u>Dunphy</u>, 136 N.J. at 104 (citing <u>Dunphy</u>, 261 N.J. Super. at 125). However, the Supreme Court endorsed the views expressed by our colleague Judge Kestin, whom, writing for the majority on the panel, held:

> Irrespective of the label placed upon a
> particular relationship, it is a jury question
> whether the inter-personal bonds upon which

the cause of action is based actually exist. A defendant should always have the right, even in the case of a parent and child or a husband and wife, to test the operative facts upon which the claim is based irrespective of the de jure relationship.

[Dunphy, 136 N.J. at 112 (quoting Dunphy, 261 N.J. Super. at 122).]

The Court expanded upon Judge Kestin's reasoning by emphasizing that "this critical determination must be guided as much as possible by a standard that focuses on those factors that identify and define the intimacy and familial nature of such a relationship." Ibid. The Court distilled this "standard" to the following basic, yet critically important factors: (1) the duration of the relationship; (2) the degree of mutual dependence; (3) the extent of common contributions to a life together; (4) the extent and quality of shared experience; and (5) whether the plaintiff and the decedent (or seriously injured person) "were members of the same household, their emotional reliance on each other, the particulars of their day to day relationship, and the manner in which they related to each other in attending to life's mundane requirements." Ibid. (quoting Dunphy, 261 N.J. Super. at 123).

Critical to our analysis here, however, is not only the Dunphy Court's unambiguous rejection of any attempt to restrict the class

of claimants to married persons, but also the articulation of the public policy underpinning the tort itself:

> The basis for that protection is the existence of an intimate familial relationship with the victim of the [tortfeasor's] negligence.
>
> An intimate familial relationship that is stable, enduring, substantial, and mutually supportive is one that is cemented by strong emotional bonds and provides a deep and pervasive emotional security. We are satisfied that persons who enjoy such an intimate familial relationship have a cognizable interest in the continued mutual emotional well-being derived from their relationship. When that emotional security is devastated because one witnesses, in close and direct proximity, an accident resulting in the wrongful death or grievous bodily injury of a person with whom one shares an intimate familial relationship, the infliction of that severe emotional injury may be the basis of recovery against the wrongdoer.
>
> [Id. at 115.]

Against this analytical backdrop, we now apply the standard codified in Rule 4:46-2(c), and hold that Benning presented sufficient evidence from which a jury could find that she and two-year-old I'Maya had an intimate familial relationship at the time of the child's tragic death. Viewed in the light most favorable to the non-moving party, the evidence shows that at the time of the accident, Benning and her now wife I'Asia Moreland, had cohabitated for at least seventeen months, sharing the

19

responsibility for the care of three young children, one of whom was I'Maya. A rational jury can find that Benning was a de facto mother to this child, and felt her loss as deeply as any parent facing that horrific event. Benning's deposition testimony supports this finding.

The duration of Benning's relationship with I'Maya indicates she had been part of this two-year-old girl's life since she was an infant. Dr. Cooke's psychological evaluation report of the family also supports the strong familial bond that existed before the accident between the children and these two "moms." Although we are confident that this record is sufficient to withstand summary judgment, both the court and the litigants would have been better served if Benning's counsel would had augmented the record with certifications from individuals who knew and saw these two women interact with these children on a day-to-day basis. These certifications may have assisted the motion judge in his decision.

Finally, we would be remiss if we did not comment on Benning's counsel's decision to include, as part of the appellate record, a photograph of the child's nude body laid out on the autopsy table. Given the limited scope of this appeal, we do not understand what possible relevance including this photograph has to the central issue in this case. Its inclusion served absolutely no legal purpose and was grossly insensitive to all involved.

Reversed and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-4754-16T4