200 N.J. Super. 191 (1985)
491 A.2d 17
OPEN DOOR ALCOHOLISM PROGRAM, INC., PLAINTIFF-APPELLANT,
v.
BOARD OF ADJUSTMENT OF THE CITY OF NEW BRUNSWICK, SEAMAN STREET HOMEOWNERS ASSOCIATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 9, 1984.
Decided April 9, 1985.
*193 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
James Hely argued the cause for appellant.
Edward J. Egan argued the cause for respondent Board of Adjustment of the City of New Brunswick.
Seaman Street Homeowners Association filed a brief (Frizell & Pozycki, attorneys; Michele R. Donato, of counsel and on the brief).
The opinion of the court was delivered by GAYNOR, J.A.D.
Plaintiff appeals from a judgment upholding a decision of defendant, Board of Adjustment (Board), revoking a building permit covering the renovation of premises at 256 Seaman Street, New Brunswick, required to make it suitable for use as a halfway house for ten recovering alcoholics. The Board determined that this proposed use was not a permitted use under the zoning ordinance nor did it constitute a continuation of a prior use authorized by a variance grant. In so concluding, the Board found the intended residents of the premises would not be functioning as a family unit and that the use of the *194 building as a halfway house for alcoholics differed from that permitted under the previously granted variance. The trial court upheld the Board's determination, citing the transient nature of the residency. We agree and affirm.
A building permit had been issued to plaintiff by the construction code official and zoning officer of the City of New Brunswick covering renovations to the building to bring it into compliance with the applicable standards for rooming and boarding houses. The permit had been issued by the officer based upon his determination that the proposed use was authorized as a nonconforming use under the previously granted variance permitting the building's use as a residence for homeless girls. Homeowners within the area of the property, organized as the Seaman Street Homeowners Association, appealed the issuance of the building permit to the Board of Adjustment. After a hearing, the Board revoked the permit and plaintiff thereupon instituted the present action to set aside the revocation.
The subject property is located within the R-B residential district which permits detached single-family dwellings, public and private nonprofit schools and churches. Conditional permitted uses include multi-family dwellings limited to town-house, apartment and garden apartment buildings, two-family dwellings and community-based residences for the mentally retarded. The intent and purpose of such zoning as set forth in the ordinance is
... to provide for the controlled density of population in balance with supporting facilities and services and also to provide for development of a range of housing types compatible with established character density of the area.
The house is a two and one-half story structure, containing five bedrooms, two and one-half bathrooms and one kitchen. It is located on a narrow lot and is in close proximity to adjoining residences. The immediate area of Seaman Street is fully improved with residential buildings. In 1973 the property had been a licensed rooming and boarding house pursuant to a variance permitting its use as a permanent home sponsored by *195 the Y.W.C.A. of Central Jersey for residency by girls and house parents, but specifically prohibiting occupancy by delinquents or mental patients or the presence of drugs. The record does not indicate when this use was terminated.
Plaintiff is a nonprofit corporation and has been in existence for about seven years, operating a day care program in New Brunswick providing group and family counseling and also providing counseling services for probationers at various facilities. It has a contract with the Department of Health, Division of Alcoholism, to operate the proposed halfway house for ten residents. According to plaintiff, the house would not be run as a treatment facility, but as a home. The residents would be persons referred from various facilities after having satisfactorily completed treatment for alcoholism. The average length of stay at the halfway house would be six months although a resident could leave at any time. Every effort would be made to establish as much of a family atmosphere as possible with the residents sharing in the cooking and living responsibilities and eating together. Visitors would be allowed only in the open area of the house and an 11 o'clock curfew would be enforced. While certified alcoholism counselors would conduct group therapy sessions in the house, no psychological counseling would be included. As a prerequisite of residency an applicant would have to be employable and obtain employment within a certain period of time after entering the program. Persons with criminal problems would be ineligible for the halfway house program and any resident who resumed drinking would be required to leave. The property would contain no signs identifying it as a halfway house and a resident house manager would be employed to administer the operation.
The resolution of the Board memorializing its revocation of the building permit granted by the construction code official contains eight findings of fact relating to the nature of plaintiff's proposed use of the property together with the following five findings as reasons for its action:

*196 There was no evidence that there would be adequate areas for recreation of the men on the premises which lack would be detrimental to the area. The closeness of the houses in the neighborhood is not conducive to a successful interrelation of neighbors and residents at a halfway house.
The use proposed is different from the use approved by the Board of Adjustment in 1973, especially in light of the Board's condition that the property not be used as a residence for drug users. Alcohol is a drug and hence the property's use by alcoholics would violate the condition imposed.
There has been no showing that there is adequate space for eleven people to live in the house.
The eleven persons would not be functioning as a family unit; the persons would only be living in the same house. The men would be essentially transients.
There is a high concentration of social agency uses in the neighborhood. This additional facility would impose an undue burden on the neighborhood and tend to change the character of the area.
In sustaining the Board's revocation of the permit, the trial court reasoned:
I can't say what the period of residency would be, but that may be the line between single-family residency of unrelated parties, as opposed to rooming house: some sort of indication of family concept of permanency, although they're not going to live there for the rest of their lives, I'm sure, and this doesn't suggest that, and that's the item that I've been troubled with, although if there would be some indication that these persons were going to remain there for an indefinite period of time, I would have no hesitancy in granting your relief, but I've been troubled with that, and consequently, I must sustain the Board, ....
On this appeal, plaintiff contends the judge erred in failing to find the proposed use of the property was a permissible single-family use thus entitling plaintiff to the issuance of the building permit. Alternatively, it is asserted the contemplated use was permissible under the variance which had been granted in 1973 and the trial court erroneously failed to make this determination. These contentions are disputed by the Board and the Homeowners Association who claim the proposed halfway house for recovering alcoholics is not the equivalent of a single-family use, that plaintiff failed to exhaust its administrative remedies by not seeking a variance and the trial court's decision was supported by sufficient credible evidence. In our view the principal and determinative issue in this case is whether the residents of the halfway house may be considered a *197 single-family unit thus bringing their use of the property within the terms of the ordinance.
The zoning ordinance defines a single-family dwelling as a "building designed for the occupancy exclusively of one family" and family as "one or more persons related by blood or marriage, or up to three unrelated individuals, living as a single housekeeping unit in a dwelling unit." A dwelling unit is defined as "any building or portion thereof permanently affixed to the ground and/or designed to be occupied by a family and providing sleeping room(s), bathroom(s) and kitchen facilities."
Although occupancy of the building as proposed by plaintiff would exceed the limit prescribed in the ordinance for a single-family dwelling, this is not an appropriate basis for denying plaintiff the use of this property. Limiting a single-family dwelling to occupancy by no more than three unrelated individuals living as a single housekeeping unit is an improper zoning restriction. As noted in State v. Baker, 81 N.J. 99, 113 (1979), "zoning regulations which attempt to limit residency based upon the number of unrelated individuals present in a single non-profit housekeeping unit cannot pass constitutional muster."
The controlling factor in considering whether a group of unrelated individuals living together as a single housekeeping unit constitutes a family, for purposes of compliance with a single-family zoning restriction, is whether the residents bear the generic character of a relatively permanent functioning family unit. Id. at 108-109. Thus, in Pemberton Tp. v. State, 178 N.J. Super. 346 (App.Div. 1981), certif. den. 87 N.J. 364 (1981), we held the use of a residence by the Department of Corrections as a group home for six to eight boys, aged 8 to 13, who had been adjudicated delinquent for minor offenses, to be a permissible single family use of the dwelling as their residency would simulate the dynamics and functioning of a natural family. We noted the boys would live in the house as siblings with substitute parents; would perform household chores such *198 as are customarily performed by boys of similar ages living with their own families; would attend public school, participate in such community activities as Scouts and Little League and would otherwise integrate with the community. As the dynamics and functioning of a natural family would thus be reproduced, we concluded that such a family-type substitute for an institutional alternative qualified as a permitted use of a dwelling in the district limited by the zoning ordinance to occupancy by single housekeeping units.
Similar rationale was utilized in Y.W.C.A. v. Bd. of Adj. Summit, 134 N.J. Super. 384 (Law Div. 1975), aff'd 141 N.J. Super. 315 (App.Div. 1976). In considering that occupancy of a residence in a single-family zone by not more than ten adolescent girls was a permissible use, the court likened such occupancy to that of a natural family of ten children.
And, in Berger v. State, 71 N.J. 206 (1976), a group home operated by the Division of Youth and Family Services for 8 to 12 unrelated multi-handicapped preschool children under the care and supervision of two foster parents was considered a single family use within the terms of the zoning ordinance. In so concluding the Court observed that the children and the foster parents "live and function as a family entity," i.e. in a style characterized by fairly stable, rather than transient, relationships and as a single household headed by adults who exercise control and guidance over the children. Id. at 217.
The similarity to occupancy by a traditional family was also the basis for viewing a transitional residence for recovered mental patients as a single-family use in Tp. of Washington v. Cent. Bergen Comm. Health, 156 N.J. Super. 388 (Law Div. 1978). There the court noted that the occupancy of the five women was permanent in character and not transitory; the responsibilities of the occupants for performing the ordinary tasks of cooking, cleaning and shopping were the same as those of other home dwellers in the community; and in all respects the residents "present a picture very much akin to that of a *199 traditional family and their lifestyle is not of a transient or temporary nature...." Id. at 418.
In considering group homes to be permissible single-family uses under zoning or covenant restrictions, courts in other jurisdictions have similarly emphasized and relied upon the functional equivalency of the proposed use to that of the traditional family, with the permissible group home being viewed as emulating family life and presenting to all outward appearances a relatively normal, stable and permanent family unit. Mongony v. Bevilacqua, ___ R.I. ___, 432 A.2d 661 (Sup.Ct. 1981); Saunders v. Clark Cty. Zoning Dept., 66 Ohio St.2d 259, 421 N.E.2d 152 (Sup.Ct. 1981); Linn County v. City of Hiawatha, 311 N.W.2d 95 (Iowa Sup.Ct. 1981); Costley v. Caromin House, Inc., 313 N.W.2d 21 (Minn.Sup.Ct. 1981); J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc., 46 N.C. App. 741, 266 S.E.2d 32 (Ct.App. 1980), rev'd 302 N.C. 64, 274 S.E.2d 174 (Sup.Ct. 1981); Leland Acres, Etc. v. R.T. Partnership, 106 Mich. App. 790, 308 N.W.2d 648 (Ct.App. 1981); Malcolm v. Shamie, 95 Mich. App. 132, 290 N.W.2d 101 (Ct. App. 1980); Children's Home of Easton v. City of Easton, 53 Pa.Commw. 216, 417 A.2d 830 (Commw.Ct. 1980); Hopkins v. Zoning Hearing Bd. of Abington Tp., 55 Pa.Commw. 365, 423 A.2d 1082 (Commw.Ct. 1980); Hessling v. City of Broomfield, 193 Colo. 124, 563 P.2d 12 (Sup.Ct. 1977); Oliver v. Zoning Comm. of Town of Chester, 31 Conn. Supp. 197, 326 A.2d 841 (Conn.C.P. 1974); White Plains v. Ferraioli, 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756 (Ct.App. 1974). See also 2 Rathkopf, The Law of Zoning and Planning (4 ed. 1984 and Cum.Supp.), § 17A.05 at 17A-22; Annotation, "What constitutes a `family' within meaning of zoning regulation or restrictive covenant," 71 A.L.R.3d 693 (1976).
It is thus evident that in order for a group of unrelated persons living together as a single housekeeping unit to constitute a single family in terms of a zoning regulation, they must exhibit a kind of stability, permanency and functional *200 lifestyle which is equivalent to that of the traditional family unit. In our view, the residents of plaintiff's proposed halfway house, although comprising a single housekeeping unit, would not bear these generic characteristics of a single family. While the residents would share in the household responsibilities and dine together, their affiliation with one another would be no different than if they were fellow residents of a boarding house. Clearly, their living arrangements would not be the functional equivalent of a family unit. The individual lifestyles of the residents and the transient nature of their residencies would not permit the group to possess the elements of stability and permanency which have long been associated with single-family occupancy. See Berger v. State, 71 N.J. at 225.
In reaching our conclusion in this case we do not, of course, deprecate the therapeutic value of peer support for recovering alcoholics. However, the location of a facility providing this benefit must comply with the local zoning ordinance or exceptions granted from those regulations. We note that in one reported case a halfway house as proposed by plaintiff, although there referred to as a rehabilitation center or recovery house for detoxified alcoholics, was deemed to be a boarding house within the terms of the zoning ordinance. Beckman v. City of Grand Island, 182 Neb. 840, 157 N.W.2d 769 (Sup.Ct. 1968).
While plaintiff alternatively contends the trial court erred in failing to determine that the proposed use was permissible by virtue of the variance which had been granted in 1973 to the Y.W.C.A. of Central Jersey, the record is insufficient to show that such error was committed. No evidence was presented as to the actual use made of the premises pursuant to the variance nor, as indicated, when the Y.W.C.A. ceased its operation of the home or under what circumstances the use was terminated. We are therefore constrained to find that plaintiff failed to demonstrate that the projected use was permitted as a continuation of the use allowed by the variance.
*201 The judgment of the Superior Court, Law Division, Middlesex County, dated November 15, 1983, dismissing plaintiff's complaint is affirmed.