**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2684-24

HEF VENTURES, LLC,

     Plaintiff-Respondent,

v.

TOWNSHIP OF HANOVER
ZONING BOARD OF
ADJUSTMENT, a New Jersey
municipal agency,

     Defendant-Appellant.

_____

Submitted February 24, 2026 – Decided April 28, 2026

Before Judges DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1588-24.

Cleary Giacobbe Alfieri Jacobs, LLC, attorneys for appellant (Marina V. Brown, of counsel and on the briefs).

Bisgaier Hoff, LLC, attorneys for respondent (Peter M. Flannery, on the brief).

PER CURIAM

In this prerogative writs matter, defendant, the Township of Hanover Zoning Board of Adjustment (Board), appeals from the April 10, 2025 Law Division order finding the Board improperly denied plaintiff HEF Ventures, LLC's application seeking a favorable interpretation[1] of Township zoning law to include plaintiff's cooperative sober living residence (CSLR or facility) as a permitted "single-family residential use." Township of Hanover, N.J., Code § 166-174(A). In its comprehensive written statement of reasons accompanying the order, the trial court analyzed the controlling ordinance defining "family," § 166-4(A), and concluded the facility's residents, who share bedrooms, living spaces, housekeeping tasks, and activities, constitute a family and operate as a "single housekeeping unit," contrary to the Board's determination. It found the Board erred by imposing a "permanence" requirement and considerations otherwise absent in the ordinance's definition of family. The trial court also determined the Board's interpretation of its ordinance violated both the Federal

---

[1] Generally, N.J.S.A. 40:55D-70(b) confers upon the Board the power to "[h]ear and decide requests for interpretation of the zoning map or ordinance." An application for a favorable interpretation requires the Board to consider a particular definition and advise an applicant whether their use falls within that definition and, thus, whether the applicant's use is permitted or prohibited. See, e.g., Nouhan v. Bd. of Adjustment of City of Clifton, 392 N.J. Super. 283, 291 (App. Div. 2007); Colts Run Civic Ass'n v. Colts Neck Twp. Zoning Bd. of Adjustment, 315 N.J. Super. 240, 245-47 (Law Div. 1998).

Fair Housing Act (FHA), 42 U.S.C. § 3605, and New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 to -50.[2]

We have considered the record in light of applicable legal principles and determine the trial court correctly found the Board erred in deciding plaintiff's residents did not constitute a family under governing zoning law. We further conclude the trial court properly applied the plain language of the ordinance to the record before the Board and correctly determined the facility is a permitted single-family residential use that does not require a use variance. In view of our decision that the trial court correctly interpreted the ordinance and properly reversed the Board's erroneous interpretation, we need not consider the Board's remaining arguments. Accordingly, we affirm.

I.

We derive the following facts from the record before the Board and before the trial court. Plaintiff's CSLR is a licensed residential home for individuals recovering from alcohol and drug addiction. It is located in a single-family structure within the Township's "R-10" single-family residential zone.

---

[2] The Board appeals only from the first two paragraphs of the court's order regarding the interpretation issue, not from the third and fourth paragraphs of the order addressing plaintiff's request for attorney's fees and costs.

A-2684-24

The facility conforms with New Jersey Department of Community Affairs (DCA) regulations governing CSLRs, promulgated in 2018, setting forth licensing requirements and operational parameters for these facilities. Specifically, the regulations define a CSLR as "a residential setting that serves solely as a home for individuals who are recovering from drug or alcohol addiction and is intended to provide an environment where the residents can support each other's sobriety and recovery." N.J.A.C. 5:27-2.1. No more than ten CSLR residents are permitted in each facility. Ibid.

The CSLR regulations are set forth within the section addressing Rooming and Boarding Houses, N.J.A.C. 5:27-1 to -14. However, only a Class F license is required to operate a CSLR, while traditional rooming and boarding houses are required to secure either Class A, B, or C licenses and are subject to different mandates for operation. N.J.A.C. 5:27-1.6(b). The definitions of "boarding house" and "rooming house" reference residences with "single room occupancy," distinct from CSLRs like plaintiff's facility wherein residents share bedrooms. See N.J.S.A. 55:13B-3(a), (h); N.J.A.C. 5:27-2.1.

In August 2023, the DCA issued plaintiff its licenses to own and operate a CSLR in the Township at its present location in a single-family structure. The facility's live-in operator oversees the residence, which is occupied by fewer

than ten residents. While staying at the facility, its residents—all recovering from substance abuse addiction and participating in continued off-site treatment—must follow specific written rules and regulations or face removal.[3] The facility's rules govern use of and behavior within the residence and include adherence to mandatory drug testing, curfews, and guest restrictions. Notably, the residents share bedrooms and common areas, including a kitchen, sometimes cook and dine together, and are given housekeeping assignments and weekly chores. All must "participate in mandatory general house cleaning."

On October 26, 2023, after the facility was operating for several months, the Township Construction Officer notified plaintiff its CSLR was prohibited within the R-10 zone. The notice advised CSLRs are not a permitted use, and plaintiff was required to apply for and secure a use variance to continue to operate.

Pertinent here, Township of Hanover, N.J., Code § 166-174 establishes the regulations applicable to the R-10 zone. It specifies "[s]ingle-family residential uses in detached single-family structures" are "[p]ermitted principal uses." § 166-174(A). It defines "single-family residence" as "[a] building or

---

[3] The facility's written rules are labeled as "Citadel 12" rules, but, as clarified at the hearing, the rules govern the facility.

structure intended to lawfully accommodate one dwelling unit," and "dwelling unit," as "[l]iving accommodations designed and used for occupancy by one family only." § 166-4(A). Importantly, the ordinance also defines "family" to mean "[a]ny number of individuals living privately together as a single housekeeping unit and using certain rooms and cooking facilities in common." Ibid.

A. The Board Hearing and Resolution

In November 2023, plaintiff applied to the Board requesting a favorable interpretation of the ordinance defining family to include the CSLR facility as a permitted single-family residential use, or, in the alternative, requesting a use variance.[4] Plaintiff contended the facility's residents functioned as a single housekeeping unit sharing common areas and met the ordinance's definition of family.

The Township Planner reviewed the application and issued a report explaining CSLRs are not expressly listed as permitted residential uses in the Code. The Planner suggested CSLRs generally are akin to rooming houses,

---

[4] As the trial court concluded the CSLR constituted a "family[,]" and was thus a permitted residential use, it did not reach the use variance issue. Therefore, we confine our consideration to plaintiff's application for a favorable interpretation of "family" and note only that the Board also denied plaintiff's use variance application.

similarly not identified as a permitted use in the Township ordinance. Thus, to determine whether the facility's residents met the definition of family and the CSLR qualified as a "[s]ingle-family residential use[] in [a] detached single-family structure[]," the Planner recommended the Board hear testimony concerning the nature and scope of the facility's operations. The Planner specified the Board should explore considerations including but not limited to criteria for admissions and departures, housing costs, oversight, residency rules and enforcement of them, number of residents and duration of stay, maintenance and housekeeping, visitation protocols and restrictions, and meal preparation and kitchen use.

The Board held its first of two hearings on May 16, 2024, to consider plaintiff's favorable interpretation application. Plaintiff presented testimony from Morgan Taylor, plaintiff's Director of Operations. Taylor confirmed plaintiff obtained licensing to operate the facility from the DCA in August 2023.

Taylor testified the facility's rules for its residents include curfew requirements, specific "non-tolerated offenses," a "no violence" and "no aggressiveness" policy, and mandated "daily chores." She clarified seven residents occupy the facility and share bedrooms and bathrooms, as well as a common kitchen, laundry room, dining room, living room, and basement. She

A-2684-24

explained there is no designated cook, but residents may choose "to be a community and eat as a family." They "cook for themselves," "do their own laundry," "clean their own rooms," and "are responsible for taking care of the house." According to Taylor, the full-time live-in operator and an additional staff member, as required by the DCA, are on site at all times.

Emphasizing the facility was newly opened, Taylor estimated, to date, the average stay for residents was "about [sixty] to [ninety] days," and noted her expectation that residents would ideally stay for a much longer duration. She clarified there is no outer limit on the length of stay. Taylor explained residents pay rent individually to plaintiff. Additionally, she testified residents are free to come and go from the facility throughout the day for work or treatment or other reasons. They are required to maintain sobriety.

Taylor likened facility residents to a "family" because "[t]hey[] maintain[] a household together, they[] eat[] together, they[] hav[e] meals together[,] . . . they[] shar[e] common space together, . . . [and] they[] go[] out on activities together." As an example, she described residents watching movies together at night. Taylor conceded the residents do not have discretion in deciding admission of new residents.

8

Thereafter, numerous members of the public addressed the Board in opposition to permitting the facility in the R-10 zone. They raised concerns regarding resident turnover and the nature of the facility in a family neighborhood. That day, the Board denied plaintiff's application by unanimous vote.

The Board returned for a second hearing one month later to consider plaintiff's alternative use variance application. After incorporating by reference the testimony from the prior proceeding, plaintiff presented two additional witnesses, Scott Kreifels, plaintiff's representative, and Paul Ricci, plaintiff's "professional planner."

Kreifels testified plaintiff selected the property to meet DCA's recommendation for placement of CSLRs in single-family structures and determined the location "checked all of [the] boxes." He indicated the average stay of the residents as between forty-five and ninety days.

Regarding the alternative request for a use variance, Ricci described the facility as an inherently beneficial use.[5] Testifying there are no other CSLRs within the Township, Ricci explained the facility met all criteria under the

---

[5] An "inherently beneficial use" is "a use which is universally considered of value to the community because it fundamentally serves the public good and promotes the general welfare." N.J.S.A. 40:55D-4.

Municipal Land Use Law. He further testified "drug and alcohol addictions or substance use disorders are considered disabilities" and after a "review of [the] zoning code, . . . individuals with substance abuse disorders are prohibited from living in a CSLR facility anywhere in [the] Township," in violation of the "[FHA] and other acts."

He described no harmful impacts from the facility's operation in the area and proposed the addition of cameras and fencing to assuage community concerns regarding the nature of the residence. Ricci reiterated "the benefits, the need associated with these facilities[,] outweighs the detriments, which are largely ['I] don't like this in my backyard.[']" He further opined he "believe[d] that this site is particularly well-suited for the use as well." He noted other group homes are allowed in the Township, including homes for those with physical and developmental disabilities and domestic violence victims. He explained there would be no substantial detriment to the public good and maintained the facility would "continue to operate in a manner similar to a single-family home."

Noting community members expressed theoretical safety concerns, Ricci indicated there had been no substantiated incidents, and he had seen no cause for concern. He added the structure was "particularly well suited" to meet the needs of the residents, especially given what he characterized as the absence of

any "direction from the [T]ownship" concerning any suitable alternate location for the CSLR within the Township. He distinguished the facility from a hotel or bed and breakfast primarily based on the indefinite length of stay and communal eating feature.

Ricci testified the State "encourage[s] this type of facility in single-family neighborhoods" and the CSLR "serves solely as a home for individuals who are recovering from drug or alcohol addiction and is intended to provide an environment where the residents can support each other's sobriety and recovery." He described "one [of] the essential purposes of a CSLR" as "emulat[ing] a family and achiev[ing] normalization and community integration of the residence." He further emphasized the public need for CSLRs, adding "this use is underserved."

Members of the community again appeared and expressed concerns about safety, the transience of resident stays, and a potential reduction in value of the surrounding properties. Members of the Board offered comments and ultimately voted unanimously to deny the use variance.

On July 18, 2024, the Board issued its written resolution, which summarized the proceedings and testimony and cited the relevant provisions of the Township's zoning law. It included the operative definitions of "single-

family residence," "dwelling unit," and "family." The resolution noted the Township's land use ordinance expressly permits certain uses in the R-10 zone, including "single-family residential uses" and "community residences and shelters." It found the transient nature of the facility rendered it outside the scope of permitted uses within the R-10 zone.

In the resolution, the Board compared plaintiff's facility with residences at issue in various cases finding unrelated residents constituted families for residential zoning purposes. The Board considered Borough of Glassboro v. Vallorosi, 117 N.J. 421, 423 (1990), in which the Court determined a group of ten unrelated college students living together and sharing chores and a common fund to pay expenses constituted a "family." Specifically, the Board noted the CSLR's differing features from those in Vallorosi, including the CSLR's licensing requirement, full-time operator, paid staffing, resident rules and lack of resident discretion over admissions and removals, individual resident leases, lack of communal funding for food or other expenses, prohibition on visitors, and non-discretionary curfew. The Board also found the approved single-family residence in Cherry Hill Township v. Oxford House, Inc., 263 N.J. Super. 25, 32 (App. Div. 1993) (finding recovering alcohol and substance abusers sharing a residence constituted a "family" where there was an elected officer, residents

decided who would be added or removed by majority vote, residents made their own meals, and residents each contributed money for operating costs), distinct from plaintiff's facility, noting the CSLR's lack of similar resident discretion and control of the residence.

The resolution cited DCA's inclusion of the CSLR regulations within the Code section pertaining to rooming and boarding houses, N.J.A.C. 5:27-1.1 to -14.1, and indicated the Board found "the DCA's responses to public comments at the time the [CSLR] regulations were adopted . . . highly relevant [and] highly persuasive, if not determinative, to the outcome of the application." Specifically, the Board noted "the DCA distinguished Oxford Houses from CSLRs, which the Board accept[ed] as true." The resolution quoted from the DCA comments to public questions contrasting CSLRs with Oxford Houses.

The Board also relied on our holding in Open Door Alcoholism Program, Inc. v. Board of Adjustment, 200 N.J. Super. 191, 200 (App. Div. 1985), in which we held a halfway house in New Brunswick where ten recovering substance abusers resided was not a single-family dwelling because it lacked the "generic characteristics of a single family." The Board compared the residence in Open Door with plaintiff's facility and found, like the halfway house in that

13

case, "neither [plaintiff] nor CSLRs in general, place control in the hands of the residents" and, thus, similarly was not an expressly permitted residential use.

The resolution then outlined the Board's denial of plaintiff's application for a use variance. The Board found no basis to conclude CSLRs are an inherently beneficial use and determined the use was "transient" and "not appropriate in a single[-]family residence" or residential zone. In denying the variance and weighing positive and negative criteria, the Board concluded the facility would have an adverse impact on the surrounding neighborhood and "substantially impair the intent and purpose of the zone plan and zoning ordinance . . . ."

B. Plaintiff's Complaint in Lieu of Prerogative Writs and Trial

Thereafter, plaintiff filed its action in lieu of prerogative writs in the Law Division in August 2024. The verified complaint alleged: (1) the Township's "Unfavorable Interpretation [w]as Ultra Vires, Unlawful, Arbit[r]ary, Capricious and Unreasonable"; (2) the Township's "Denial of [plaintiff's] Use Variance [w]as Arbitrary, Capricious and Unreasonable"; (3) a "Violation of [the FHA]"; (4) a "Violation of [NJLAD]"; and (5) "[plaintiff] is entitled to a declaration of its rights and of the obligations of the Zoning Board."

The court held a hearing the following February.  At oral argument, plaintiff framed as "the primary issue" the interpretation of the ordinance and its application to the CSLR.  Plaintiff argued the facility was "strictly a residential setting," and noted recent DCA guidance clarified a "CSLR is not a rooming house."  Plaintiff produced a September 7, 2023 letter from the DCA's Chief of the Bureau of Rooming and Boarding House Standards, Bernard Raywood, explaining CSLRs are subject to the regulations which govern rooming and boarding houses, but are functionally distinct from a "Class A Rooming House."[6] Raywood contrasted the CSLR, in which residents "live together," "support each other," "become familiar with each other and depend on one another as part of a single housekeeping unit," with rooming houses, in which "residents do not operate as a single housekeeping unit," "do not know each other," "live in a single occupancy room with a lockable door," "are not required to complete housekeeping," and "are not supervised."

Describing CSLRs as a "relatively new use licensed by the State," plaintiff drew comparisons with Oxford Houses, and distinguished plaintiff's facility from a "rooming or boarding house," as the facility does not "operat[e] on a single-room occupancy level."  Plaintiff highlighted the DCA's "intent" that

_____

[6] It does not appear the Raywood letter was considered by the Board.

15

CSLRs would be set up in single-family structures, citing DCA's response to public comments regarding the new regulations. Specifically, plaintiff highlighted DCA's stated expectation that "CSLRs would be permitted to be located in any building arrangement covered by the one- and two-family dwelling subcode." 50 N.J.R. 310(a) (Jan. 16, 2018) (response to comment 27); see also N.J.A.C. 5.23-3.14(b)(3)(xv) (CSLRs are "Residential Group R-5 occupancies" which includes "detached one- and two-family dwellings").

Plaintiff further emphasized the lack of any other possible location for a CSLR within the Township. Plaintiff disagreed with the Board's suggestion CSLRs could be located in the B-10 zone, which allows "clinical, office-type uses," arguing overnight lodging is prohibited in that zone with the exception of hotels.

Plaintiff argued its residents' stays are not transient. It further asserted the unambiguous ordinance language contained no stability and permanency requirement in the definition of "family," citing Oxford House's "clear" mandate that, in the absence of particular language in the ordinance, a time requirement may not be added. Plaintiff also contended the sixty-to-ninety-day stay duration range corresponded to other single-family home arrangements, including: "a month-to-month lease," "members of household who are . . . home from college

and only living in the house for a few months at a time," and "residents who are roommates and leave for job relocation."

The Board argued plaintiff's facility was not operating as a single-family unit and likened it instead to the Open Door halfway house we previously found was not operating as a "functional equivalent of a family unit." 200 N.J. Super. at 199-200. Indicating the CSLR license required "at least one person [be] awake [twenty-four] hours a day in the facility," the Board emphasized this as a vital distinction from a "traditional single-family housekeeping unit." The Board also contended the court owed deference to the Board tasked with interpreting its ordinances.

On April 10, 2025, the court entered an order reversing the Board's decision and finding plaintiff's facility operated as a single housekeeping unit and its residents constituted a family under the ordinance. In its thorough accompanying statement of reasons, the court detailed the history of the case, the applicable standard of review, general principles of statutory construction, and the relevant sections of the Township's Code. As a threshold matter, the court found the Board's interpretation of its ordinance would not only prohibit the operation of a CSLR in the residential zone but "effectively bar[] the

17

operation of a CSLR anywhere in the Township," as other zoning regulations would prohibit the use for various reasons in other zones.

Addressing the alleged FHA and NJLAD violations resulting from the Board's decision, the trial court observed "[t]he FHA considers those in recovery to be disabled and protected," and NJLAD treats "past drug use followed by rehabilitation . . . as a protected disability." It concluded plaintiff had established a prima facie case pursuant to each statute and, "[b]ecause the Board failed to establish a cognizable nondiscriminatory basis for the interpretation, its interpretation of the Zoning Ordinance is violative of the FHA and NJLAD and erroneous."

Next, in evaluating whether a CSLR is a "family" under the ordinance definition, the court likened the facility to the approved single-family residences in Vallorosi, 117 N.J. at 421, and Oxford House, 263 N.J. Super. at 25, where residents "live together in a single-family dwelling, some share bedrooms, they are responsible for their own cooking, laundry, cleaning, and shopping, and they share household tasks." It distinguished Open Door, 200 N.J. Super. at 191, finding the Open Door residents "had individual lifestyles, did not engage in activities together, and were too transient." The court further contrasted the facility with a rooming house in which there is "single-room occupancy and the

presence of security locks." By contrast, the court found CSLR residents share bedrooms and common spaces, sometimes cook and dine together, and collectively share housekeeping and other chores.

The court determined the Board incorrectly considered the "permanence" of the resident stays, which it found is not a "requirement under the [z]oning [o]rdinance, thus the length of stay of residents of a CSLR is irrelevant." According to the court, the Board also "fail[ed] to demonstrate that a CSLR cannot operate to preserve a family style of living as required in the R-10" zone and did "not demonstrate[] how the DCA's regulation of house rules is any different from a landlord having rules for tenants renting a house or apartment."

The court further found no basis for the Board's emphasis of the CSLR's "resident supervision" as a significant distinction from unsupervised Oxford Houses. The court cited other non-prohibited living arrangements including "live-in babysitters or unrelated caregivers who are present in a family's home for supervision of children, the elderly or disabled." The court observed no intent within either the Township Master Plan or any zoning ordinance to restrict "the presence of a live-in operator" in a single-family residence. Thus, the court concluded that including a CSLR within the definition of family is consonant with the ordinance's intent, and the facility functions as a family within the

ordinance's plain meaning. Finding the facility to be a permitted single-family residential use within the R-10 zone, the court remanded plaintiff's application for reconsideration in light of its decision.

II.

The Board appeals, arguing the trial court failed to accord the requisite deference to its interpretation of its own ordinance, usurped the authority of the Zoning Board and circumvented the statutory requirement of a use variance, erroneously determined the ordinance included plaintiff's CSLR as a permitted single-family use, and improperly determined the Board's interpretation violated the FHA and NJLAD. The Board further asserts its interpretation of its ordinance was supported by credible evidence in the record and was "neither arbitrary, capricious, nor unreasonable."

"[W]hen reviewing the decision of a trial court that has reviewed municipal action, we are bound by the same standards as . . . the trial court." Fallone Props., L.L.C. v. Bethlehem Twp. Planning Bd., 369 N.J. Super. 552, 562 (App. Div. 2004). Because zoning boards have "peculiar knowledge of local conditions," Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of the Twp. of Franklin, 233 N.J. 546, 558 (2018) (quoting Price v. Himeji, LLC, 214 N.J. 263, 284 (2013)), their decisions are afforded substantial deference and are shrouded

in presumptive validity.  Price, 214 N.J. at 284.  Indeed, we give "substantial deference to [the Board's] findings of fact," which will not be disturbed when grounded in the record.  Fallone Props., 369 N.J. Super. at 562.  We reverse only when those findings are proven to be arbitrary, capricious, or unreasonable, Dunbar Homes, 233 N.J. at 558, or demonstrate a "clear abuse of discretion," Price, 214 N.J. at 284.

However, "[a]lthough a municipality's informal interpretation of an ordinance is entitled to deference . . . the meaning of an ordinance's language is a question of law that we review de novo."  Dunbar Homes, Inc. v. Zoning Bd. of Adjustment of the Twp. of Franklin, 448 N.J. Super. 583, 595 (App. Div. 2017) (omission in original) (quoting Bubis v. Kassin, 184 N.J. 612, 627 (2005)).  De novo review "is the proper standard for review despite the statutory power granted to the Board to interpret its zoning ordinance."  Colts Run Civic Ass'n, 315 N.J. Super. at 247 (citing Cherney v. Matawan Zoning Bd. of Adjustment, 221 N.J. Super. 141, 145 (App. Div. 1987)).  Similarly, "[w]hen the sole issue before us is the meaning of language in an ordinance, the trial judge's determination is not entitled to any special deference because the issue is one of law which is always subject to review de novo."  Mountain Hill, L.L.C. v.

Zoning Bd. of Adjustment of the Twp. of Middletown, 403 N.J. Super. 210, 234 (App. Div. 2008).

In interpreting their language, "[m]unicipal '[z]oning ordinances are to receive a reasonable construction and application, and . . . are to be liberally construed in favor of the municipality.'" Id. at 236 (omission and second alteration in original) (quoting Place v. Bd. of Adjustment, Borough of Saddle River, 42 N.J. 324, 328 (1964)). "However, '[z]oning regulations are restrictive of property rights and ought not to be too broadly interpreted against the possessor thereof[,]'" thus, "[s]uch 'limitations on the use of private property must be clearly and expressly imposed, and should not be inferred.'" Ibid. (first alteration in original) (emphasis added) (first quoting Skinner v. Zoning Bd. of Adjustment, Twp. of Cherry Hill, 80 N.J. Super. 380, 388 (App. Div. 1963); then quoting Hrycenko v. Bd. of Adjustment, City of Elizabeth, 27 N.J. Super. 376, 379 (App. Div. 1953)).

When language is included or excluded from a statute, "it is generally presumed that [the Legislature] acts intentionally and purposely in the . . . inclusion or exclusion." Shipyard Assocs., LP v. City of Hoboken, 242 N.J. 23, 38 (2020) (alteration in original) (quoting DCPP v. R.L.M., 236 N.J. 123, 148 (2018)). Courts will defer to an administrative agency's "reasonable"

or "permissible" interpretation of an ambiguous ordinance regardless of whether the court would reach a different conclusion. Somers Assocs., Inc. v. Gloucester Twp., 241 N.J. Super. 323, 343 (App. Div. 1990).

Preliminarily, and guided by these principles, we are not persuaded the trial court failed to accord appropriate deference to the Board or usurped its authority in construing the ordinance's plain meaning. We are satisfied the trial court reviewed the Board's determination under the appropriate standards, as set forth in painstaking and accurate detail in its written reasons. Ultimately, the court recognized the Board's interpretation of the plain language of the ordinance presented a question of law. It then reviewed the Board's conclusion the facility did not constitute a family under the plain language of the ordinance for an abuse of discretion. We discern no error and now conduct the same review.

A review of the ordinance under applicable law persuades us, as it did the trial court, the Board incorrectly altered the plain definition of family to include restrictive requirements beyond those established in the ordinance. Express and unambiguous ordinance language controls and may not be revised to change its plain meaning or blur its clear contours. Here, the Board grafted additional considerations, fatal to plaintiff's application, into the express and unambiguous

definition of "family" and determined the facility was too "transient" and controlled by its central operator rather than residents to fit within the scope of the well-defined term. In so acting, the Board erred as a matter of law and misused its otherwise weighty discretion.

Again, the relevant ordinance definitions here are few and their language plain. "Single-family residential uses in detached single-family structures" are permitted uses within the R-10 zone. § 166-174(A). A "single-family residence" is "a building or structure intended to lawfully accommodate one dwelling unit," and a "dwelling unit" means "[l]iving accommodations designed and used for occupancy by one family only." Ibid. (emphasis added). And, critically, "family" is defined as "[a]ny number of individuals living privately together as a single housekeeping unit and using certain rooms and cooking facilities in common." Ibid. (emphasis added).

Employing principles of statutory interpretation, we, like the trial court, detect no language in the ordinance definitions imposing a permanence or more lengthy duration of stay requirement imposed by the Board. We similarly determine the Board arbitrarily emphasized the CSLR's live-in operator as a characteristic somehow antithetical to the ordinance's definition of family, without basis in the ordinance or other applicable law. Accordingly, we

24

conclude the Board erroneously interpreted the ordinance and improperly based its decision on that flawed interpretation.

The facility's residents' stay duration is potentially unlimited. They share bedrooms, common areas, and housekeeping responsibility for the residence. They share a kitchen, where they sometimes cook, dine, and share meals together. The residents watch movies and participate in activities together. We, like the trial court, recognize the facility operates as a single housekeeping unit falling within the express definition of family. Applying the ordinance as written, the uncontested record demonstrated the facility's residents are prototypical: (1) "individuals"; (2) "living privately together as a single housekeeping unit"; and (3) "using certain rooms and cooking facilities in common." Thus, they fall squarely within the ordinance definition.

We discern nothing about the presence of a supervisor or strict house rules that excludes a residence occupied by unrelated individuals from the ordinance's clear definition of family. We do not view a group of residents living together with a supervisor and a single-family housekeeping unit as per se mutually exclusive groups. To the contrary, we note most family settings are marked by some aspect of central control or supervision, often marked by house rules with consequences. Similarly, the facility's residency durations, unlimited in length,

25

are consonant with other similar family uses, such as off-campus school-related housing or Oxford Houses.

Although we certainly recognize municipalities may enact laws to promote family and stability, see State v. Baker, 81 N.J. 99, 106 (1979), courts adhere to the express language of the respective ordinance to determine the breath of any definition of family, see Oxford House, 263 N.J. Super. at 51. The Court in Vallorosi, determined the group of college students living together, some with "four-month leases," met the zoning code's definition of family because they functioned in a manner that met the "stable and permanent" requirement explicitly stated in the controlling ordinance. 117 N.J. at 422, 424. In determining the group met the ordinance's definition, the Court explained "[t]he concept of a one family dwelling is based upon its character as a single housekeeping unit." Id. at 427 (alteration in original) (quoting Berger v. State, 71 N.J. 206, 227 (1976)); see also Baker, 81 N.J. at 104, 114 (finding two families within a single-family residence functioned as a single housekeeping unit based in part on their common use of the residence).

In Oxford House, we reversed the trial court's and Zoning Board's finding the unrelated recovering drug and alcohol abusers residing in the single-family home did not constitute a "family" and were not a permitted use within a single-

family residential zone. 263 N.J. Super. at 44. After finding unconstitutional a portion of the municipal ordinance restricting the term family to only those in "a domestic relationship based upon birth, marriage or other domestic bond," we considered the parameters of the surviving language defining as family "a collective body of persons doing their own cooking and living together upon the premises as a separate housekeeping unit . . . ." Ibid. We declined to read additional requirements into the residual ordinance and clarified, "If a municipality desires to require specific 'characteristics of a single family,' it must set forth those requirements in a 'functional' standard which is 'capable of being met by either related or unrelated persons.'" Id. at 48 (quoting Vallorosi, 117 N.J. at 431).

Thus, here, as we determined in Oxford House, "If the Township requires 'permanence and stability' as part of its definition of family, it must include these requirements in its ordinance." Id. at 51 (emphasis added). It did not do so.[7] Absent such language, the Board may not exclude from the definition of family unrelated individuals, residing together for potentially limited duration, who otherwise meet the definition of family operating as a single housekeeping unit.

---

[7] We further observe the Township's definition of "family" was last amended in 2019, after the DCA's promulgation of CSLRs and over twenty-five years after Oxford House was decided.

Similarly, the Board may not arbitrarily exclude households of otherwise qualifying residents from its definition of family merely because they are subject to the rules of a central supervisor or arbiter of conduct—a limitation not mentioned in the ordinance. Thus, the Board's decision cannot stand.

Even were we to afford, for purposes of argument, some further elasticity to the otherwise plain language of the ordinance, we note the Board overlooked the facility's significant, hallmark characteristics of a single-family housekeeping unit. The record showed the residents' stays are of indefinite duration, with no limitation on their outer length, and the goal of longer stays in the supportive environment. The residents function in a collectively beneficial manner designed to stabilize and support their continued sobriety. As did the trial court, we equate the residents at the facility to those in Vallorosi and Oxford House. As in those cases, we do not view the uncertain stay duration in plaintiff's facility as undermining the otherwise clear hallmarks of family exhibited by those unrelated groups.

We are unpersuaded that our decision in Open Door, 200 N.J. Super. at 191, commands a different conclusion. There, the ten halfway house residents were viewed as too transient to constitute a family. Id. at 199-200. Here,

28

evidence of such transience is not present in the record which instead reflects a residence operating with a goal of promoting stability.

Indeed, CSLRs are generally designed so "residents can support each other's sobriety and recovery." N.J.A.C. 5:27-2.1. Here, the facility's residents endeavor together to maintain the home in that mutually beneficial manner. They reside in common living, dining, and sleeping spaces, work in tandem while following house rules, and participate in recreational activities together. These are not silos operating individualistically while simply residing in one place; these are intersecting lives, operating together daily for the common welfare of the group. Such are central traits of family settings.

We are similarly unpersuaded the DCA's placement of the CSLR regulations within its section on rooming and boarding houses alters the analysis, as a review of the Code section as a whole evidences different licensing requirements and characteristics for CSLRs. Further, DCA's own guidance and responses to public commentary clarify DCA's intent that CSLRs operate in residential neighborhoods, see 50 N.J.R. 310(a) (Jan. 16, 2018) (response to comment 27); see also N.J.A.C. 5.23-3.14(b)(3)(xv). The DCA Chief of the Bureau of Rooming and Boarding House Standards confirmed the intent that CSLR residents "live together," "support each other," "become familiar with

each other and depend on one another as part of a single housekeeping unit," distinct from rooming houses, in which "residents do not operate as a single housekeeping unit," "do not know each other," "live in a single occupancy room with a lockable door," "are not required to complete housekeeping," and "are not supervised." Contrary to the Board's findings, the DCA's statements support the view that CSLRs are single housekeeping units.

Having determined the trial court correctly interpreted "family" as defined by Township of Hanover, N.J., Code § 166-4(A) to include plaintiff's facility, we need not reach plaintiff's claims under the FHA and NJLAD, as plaintiff's facility is a permitted single-family residential use.

To the extent we have not addressed them, any remaining arguments raised by the Board lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hawley

Clerk of the Appellate Division

A-2684-24